STONE, J.
11 This appeal arises from the trial court’s judgment canceling a mineral lease granted by Gloria’s Ranch, L.L.C., to Tauren Exploration, Inc. The trial court awarded Gloria’s Ranch over $23,000,000 in monetary awards and close to $1,000,000 in attorney fees. Tauren Exploration, Inc., Cubic Energy, Inc., EXCO USA Asset, Inc., and Wells Fargo Energy Capital, Inc., were found solidarily liable for these awards. For the following reasons and based on the individual facts and circumstances of this case, we affirm the trial court’s judgment and award additional attorney fees.
FACTUAL AND PROCEDURAL BACKGROUND
On September 17, 2004, Gloria’s Ranch, L.L.C., (“Gloria’s Ranch”), granted a mineral lease (“the lease”), covering 1,390.25 acres in Sections 9, 10, 15, 16, and 21, Township 15 North, Range 15 West, Cad-do Parish, Louisiana (“the property”), to Tauren Exploration, Inc. (“Tauren”). The lease granted Tauren the exclusive right to explore for, and produce minerals from, any and all depths, horizons, and formations under the land. The primary term of the lease was three years; thereafter, the lease continued “as long ... as oil, gas, sulphur or other minerals ... produced from said land hereunder or from land pooled therewith.” The lease also contained vertical and horizontal Pugh clauses.[1]
|2On February 13, 2006, Tauren assigned an undivided 49% interest in the lease to Cubic Energy, Inc, (“Cubic”). The effective date of the assignment was February 6, 2006.
On March 5, 2007, Tauren and Cubic executed separate credit agreements with Wells Fargo Energy Capital, Inc. (‘Wells Fargo”). Pursuant to its credit agreement with Wells Fargo, Cubic received a revolving credit facility[2] not to exceed $20,000,000 outstanding at any time and a $5,000,000 convertible term loan.[3] As security for its loans with Wells Fargo, Cubic mortgaged its interest in mineral leases with various landowners, including Gloria’s *1208 Ranch, and collaterally assigned the profits therefrom (“Cubic mortgage”).[4]
In 2007, Tauren contracted with Fossil Operating, Inc. (“Fossil”), to conduct oil and gas operations on the property.[5] Fossil drilled and completed wells on Gloria’s Ranch’s property in Sections 9,10, and 16. The wells in Sections 9 and 10 (“Gloria’s Ranch 9-1” and “Gloria’s Ranch 10-1”) were vertically drilled' to the Cotton Valley formation. Fossil vertically drilled the well' in Section 16 (“Gloria’s Ranch 16-1”) to the IsHaynesville Shale formation, but completed the well only to the shallower Cotton Valley formation.
During the primary term of the lease, Chesapeake Operating, Inc. (“Chesapeake”), conducted oil and gas operations in Sections 16 and 21. Chesapeake completed Cotton Valley wells in Sections 15 and 21 (“Soaring Ridge 15-1” and “Féist-21—1”), which were unitized with Gloria’s Ranch’s property in those sections. In 2008, all of Gloria’s Ranch’s property in Section 15 was unitized in the Soaring Ridge 15-15-15H (“Soaring Ridge 15H”), a 640-acre unit that Chesapeake horizontally drilled into the Haynesville Shale formation.
On September 1, 2009, Gloria’s Ranch executed a top lease[6] to Chesapeake for the right to conduct oil and gas operations on its property in Section 21.
On October 80> 2009, Tauren and EXCO USA Asset, Inc. (“EXCO"), negotiated a purchase and sale agreement whereby EXCO purchased Tauren’s 51% interest in the. lease as to all depths below the base of the Cotton Valley formation (“deep rights”). On November 9, 2009, Tauren formally assigned its deep rights interest in the lease to EXCO for $18,000 per acre. Tauren maintained a 51% interest in the lease as to all depths above the base of the Cotton Valley formation (“shallow rights”).
|4By virtue of the EXCO sale, Wells Fargo released the mortgage it had on Tauren’s interest after receiving repayment and compensation' pursuant to the credit agreement. As a condition of Wells Fargo releasing the mortgage, Tauren assigned a 10% net profits interest in its shallow rights interest in the lease to Wells Fargo.' Additionally, on November 9, 2009, Cubic assigned to Tauren an overriding royalty interest in the deep rights of its 49% interest in the lease. Tauren immediately assigned a portion of this overriding royalty interest to Wells Fargo.
On December 3, 2009, Gloria’s Ranch sent a letter to Tauren, Cubic, EXCO, and Wells Fargo (collectively referred to as “the defendants”), requesting they provide information on the monthly revenue and operating expenses of the wells on or unitized with the lease. In the letter, Gloria’s Ranch expressed a belief that the lease *1209 had expired, in whole or in part, for lack, of production in paying quantities. After investigating the .matter, Tauren responded it had incorrectly allocated monthly revenues and operating expenses of the Gloria’s Ranch 9-1, 10-1, and 16-1. Tauren recalculated the revenue and operating expenses, and determined the lease was operating at a profit. Tauren’s response ■made no mention of the Feist-21 or the Soaring Ridge 15H. On January 28, 2010, dissatisfied with Tauren’s reply, Gloria’s Ranch sent a letter to the defendants demanding a recordable act evidencing the expiration of the lease. However, the defendants did not reléase the lease.
Subsequently, Gloria’s Ranch filed suit against the defendants for their failure to furnish a recordable act evidencing the expiration of the lease, In its petition, Gloria’s Ranch argued the lease expired in 2009, in whole or in part, for failure to produce in paying quantities. Gloria’s Ranch argued |fithe. defendants’ failure to release the lease prevented it from leasing the property to others, thereby damaging it in the amount of bonus payments, rentals, and rpyalties it would have received. Gloria’s Ranch later amended its petition to include a claim for unpaid royalties. According to Gloria’s Ranch, if the trial court found the lease was maintained in Section 15 by production from the Soaring Ridge 15H, the defendants failed to pay royalties on the well’s production.
On August 13, 2014, Gloria’s Ranch executed a settlement agreement with EXCO. Gloria’s Ranch granted EXCO a new lease, and EXCO was dismissed from the suit (“EXCO settlement”).
Following a four-day bench trial, the trial court rendered judgment declaring the lease “expired” and “canceled,” In its oral reasons for judgment, the trial court stated:
The lease terminated as to all depths below the Cotton Valley Sand because the defendants did not drill the 16-1 well in good faith. Additionally, the lease expired as to depths in Sections 9, 10, 16, and 21 ’because there was no production in paying quantities from the unit wells for at least 12 months prior to January 28th, 2010,
The trial court awarded damages for lost-leasing opportunities at $18,000 per acre. Additionally, the trial court found Gloria’s Ranch was entitled to royalties from the Soaring Ridge 15H’s production, plus punitive damages for the defendants’ failure to pay royalties upon written notice of nonpayment. The defendants were found soli-darily liable for Gloria’s Ranch’s damages and attorney fees as follows:
1. $22,806,000 for the lost leasing opportunities in Sections 9,10, and 16 ($18,000 per acre for 1,267 acres).[7]
, k2. $242,029.26 for unpaid royalties from the Soaring Ridge 15H.
3. $484,058.52 as a penalty for failure to pay royalties due from the Soaring Ridge 15H.
4. $925,603 for Gloria’s Ranch’s pre- . trial attorney fees and expert costs; and
5. $11,200 for attorney fees incurred by Gloria’s Ranch during trial.
Tauren, Cubic, and Wells Fargo filed motions for new trial. On November 23, 2015, the trial court issued a judgment granting the motions, in part, to reduce the damage awards by 25% to account for the EXCO settlement. Asserting separate *1210 assignments of error, Tauren, Cubic, and Wells Fargo now appeal.[8]
DISCUSSION
Standard of Review
It is well settled that a court of appeal may not set aside a trial court’s or a jury’s finding of fact in the absence of “manifest error” or unless it is “clearly wrong.” Rosell v. ESCO, 549 So.2d 840, 844 (La. 1989). In Hayes Fund for First United Methodist Church of Welsh, LLC v. Kerr-McGee Rocky Mountain, LLC, 2014-2592 (La. 12/08/15), 193 So.3d 1110, the Supreme Court reaffirmed the manifest error standard of review, and articulated the duty of appellate courts when reviewing a trial court’s factual finding. According to the Supreme Court, an appellate court may not reverse a trial court’s factual finding by determining it would have found the facts of the case differently. Rather, in reversing a trial court’s factual ^conclusions, an appellate court is obliged to satisfy the following two-step process based on the record as a whole: 1) there must be no reasonable factual basis for the trial court’s conclusion; and 2) the finding must be clearly wrong. Hayes, supra; Stobart v. State through Dept. of Transp. & Dev., 617 So.2d 880, 882 (La. 1993).
In determining whether the trial court’s finding was clearly wrong or manifestly erroneous, the Supreme Court stated the two-step process requires the appellate court to review the entire record. The issue to be resolved on review is not whether the judge or jury was right or wrong, but whether the judge’s or jury’s fact-finding conclusion was a reasonable one. Hayes, supra; Rosell, supra. Notably, reasonable persons frequently can and do disagree regarding causation in particular cases, but where there are two permissible views of the evidence, the fact-finder’s choice between them cannot be manifestly erroneous or clearly wrong. Hayes, supra; Rosell, supra; Baw v. Paulson, 50,707 (La. App. 2 Cir. 06/29/16), 198 So.3d 186, 190. The Supreme Court, quoting an earlier opinion, summarized the deferential nature of this standard of review as follows:
The manifest error doctrine is not so easily broached. Rarely do we find a reasonable basis does not exist in cases with opposing views. We note it is not hard to prove a reasonable basis for a finding, which makes, the manifest error doctrine so very difficult to breach, and this is precisely the function of the manifest error review. A reviewing court only has the “cold record” for its consideration while the trier of fact has the “warm blood” of all the litigants before it. This is why the trier of fact’s findings are accorded the great deference inherently embodied in the manifest error doctrine. So once again we say it should be a rare day finding a manifest error breach when two opposing views are presented to the trier of fact.
Hayes, 193 So.3d at 1117 (quoting Menard v. Lafayette Ins. Co., 09-1869 (La. 03/16/10), 31 So.3d 996, 1011).
1/However persuasive the argument, appellate courts do not function as choice-making courts; appellate courts function as errors-correcting courts.” Hayes, 193 So.3d at 1112. With this principle in mind, we consider the defendants’ assignments of error challenging the trial court’s November 23, 2015 judgment.
Tauren’s Assignments of Error

Production in Paying Quantities

Tauren argues the trial court erred in finding the lease expired as to *1211 Sections 9, 10, 16, and 21, no later than January 28, 2010, for failure to produce in paying quantities. La. R.S. 31:124 (“Article 124”) requires production in paying quantities when a mineral lease is maintained by production of oil or gas. The jurisprudence is well settled that even though production continues beyond the primary term, the term of the lease may expire and the contract be automatically dissolved if production is not “in paying quantities.” Landry v. Flaitz, 245 La. 223, 233, 157 So.2d 892, 895 (1963); B.A. Kelly Land Co., L.L.C. v. Questar Expl. & Prod. Co., 47,509 (La.App. 2 Cir. 11/14/12), 106 So.3d 181, 191, writ denied, 2013-0331 (La. 04/19/13), 112 So.3d 223. One of the prime motivations of the requirement that there be production in paying quantities is that the lessee should not be permitted to maintain the lease indefinitely merely for speculative or other selfish purposes. La. R.S. 31:124, comment.
The standard by which paying quantities is determined is whether or not under all the relevant circumstances, a reasonably prudent operator would, for the purpose of making a profit or minimizing loss, continue to operate a well in the manner in which the well in question was operated. La. R.S. 31:124, comment; see also Middleton v. EP Energy E & P Co., L.P., 50,300 (La.App. 2 Cir. 02/03/16), 188 So.3d 263, writs denied, 2016-0786 (La. 06/17/16), 192 So.3d 773, 2016-0778 (La. (06/17/16), 192 So.3d 774; and Wood v. Axis Energy Corp., 2004-1464 (La.App. 3 Cir. 04/06/05), 899 So.2d 138, 143, writ denied, 2005-1137 (La. 06/17/05), 904 So.2d 702. Implicit in the term “paying quantities” is the requirement that the production income exceed operating expenses. Middleton, supra.
Louisiana courts generally use a 12-month to 18-month period to evaluate whether or not a well is producing in paying quantities. See Wood, supra (12-month period used); Edmundson Bros. P’ship. v. Montex Drilling Co., 98-1564 (La.App. 3 Cir. 05/05/99), 731 So.2d 1049 (18-month period used); and Menoah Petroleum, Inc. v. McKinney, 545 So.2d 1216 (La. App. 2 Cir. 1989) (12-month period used).
. After hiring attorneys to review the status of the lease, Gloria’s Ranch requested accounting information on the wells from the defendants. Gloria’s Ranch informed the defendants that the production volumes reported on the Louisiana Department of Conservation’s-Website, SONRIS, appeared too low to be in paying quantities. After taking over a month to respond to the request, Barry Cannaday (“Canna-day”), legal counsel for Tauren and Fossil, provided lease operating statements showing that the Gloria’s Ranch 9-1 and 16-1 produced a positive net income of $16,265 and $25,383, respectively, and that Gloria’s Ranch 10-1 produced a net loss of $28,239. Based on his assessment of the operating statements, Cannaday opined the lease-was making a profit and in compliance with Article 124.
After filing suit and further investigating the matter, Gloria’s Ranch discovered the operating statements provided by Can-naday had been altered to make the wells appear more profitable. After receiving the authentic, 11flunaltered operating statements, Gloria’s Ranch observed the operating statements provided by Cannaday excluded the following expenses: 1) administrative charges (a monthly payment of $1,025 to Fossil for operating the well, as provided in the joint operating agreement); 2) ad valorem taxes (the annual severance tax collected by the State of Louisiana on- all oil and gas production in the state); 3) contract labor (cost of maintenance on the wells); and 4) routine chemical charges (soap sticks dropped into the wells to increase the flow rate by *1212 lowering, the hydrostatic head, on the formation).
Additionally, the altered operating statements reduced each well’s monthly charge for using Tauren’s common processing facility [9] (“common facility charge”) to a flat rate of .036 cents per thousand cubic feet (“mcf’). Originally, the wells were charged using the throughput method, which allocates each well a fraction of the processing facility operating costs, determined by dividing the volume of production sent from the well to the facility by total volume of all production from all wells sent to the facility. Notably, Tauren’s common processing facility had an average yearly operating cost, of $1,457 -per mcf in 2009.
Mike Cougevan (“Cougevan”), an'oil and gas' accounting expert,' testified it is against industry standard to exclude administrative charges, ad valorem taxes, contract labor costs, and routine chemical charges as operating expenses, and that all should be included- in a paying quantities analysis. As for the common facility charge, Cougevan testified the vast majority of facility operators use the throughput method in allocating the costs of using a common processing facility. Cougevan further stated the |n throughput method is supported and recommended in the Council of Petroleum Accountants Societies Guidelines. George McGovern (“McGovern”), the defendants’ certified public accounting expert, agreed that many of the expenses removed from the operating statements should be considered in a paying quantities analysis. John Ross (“Ross”), executive vice-president of Cubic, admitted at trial that some of the expenses were improperly excluded.
After reviewing the authentic accounting records of the wells, Cougevan opined the Gloria’s Ranch 9-1, 10-1, and 16-1 did not produce in paying quantities for the 18-month period prior to Gloria’s Ranch’s demand for release from the lease. Cougevan found that each well cost more money to operate than revenue generated. Between July 2008 and December 31, 2009, the Gloria’s Ranch 9-1, 10-1, and 16-1, suffered cumulative net losses of $85,743.41, $70,837.10, and $59,927.08, respectively, for a total cumulative net loss of $216,507.59. Marc DeRouen (“DeRouen”), a certified public accountant, assisted Cougevan with his report. DeRouen testified the wells were significantly unprofitable during the 18-month period.
Robert McGowén (“McGowen”), a petroleum engineering expert, reviewed the production information and accounting records for Chesapeake’s Feist-21, and concluded the well was “clearly” not producing in paying quantities. McGowen testified the Feist-21 produced very little oil, and determined it had a cumulative net loss of $116,248.74 between May 2007 and February ■ 2010. McGowen asserted the Feist-21, along with the Gloria’s Ranch 9-1, 10-1, and 16-1, were not producing profitably and had reached their economic life. McGowen opined that a reasonably Imprudent operator would not have continued to operate the wells in order to make a profit from production.
Despite the wells’ unprofitability, Tau-ren argues it maintained the lease by presenting a legitimate ongoing business plan to develop the Haynesville Shale formation. After realizing the Haynesville Shale required horizontal completion, Tauren stated it began aggressively ■ seeking a business partner with the capital to drill numerous multimillion dollar wells into the Haynesville Shale. Tauren eventually contracted with EXCO to develop and drill such wells, and informed Gloria’s Ranch *1213 that the venture with EXCO could potentially yield monthly royalties in excess of $200,000. Mike McKenzie • (“McKenzie”), the defendants’ petroleum expert, testified that whether a well is producing in paying quantities depends .on the totality of the circumstances, which includes not only profitability, but market conditions and rework, reserve, and exploration potential. Based on his interpretation of Article 124, McKenzie testified that despite the wells’ unprofitability, the lease was maintained by a legitimate ongoing business plan to develop the lease.
After reviewing the evidence presented at trial, it is abundantly clear the Gloria’s Ranch 9-1, 10-1, and 16-1 and the Feist 21-1 failed to produce in paying quantities for the 18-month period prior to Gloria’s Ranch’s demand for release from the lease. In order to have production in paying quantities, the lease must produce in quantities sufficient to meet current operating expenses and yield a small profit, and the existence of an ongoing business plan to develop the Haynesville Shale does not exempt the defendants from this requirement. La. R.S. 31:124, comment. Gloria’s Ranch presented indisputable evidence that the operating expenses of the |iswells significantly exceeded the revenue. By their own admission, the defendants endured significant net losses from the wells in hopes of selling the deep rights in the lease and profiting from the Haynesville Shale boom. The defendants’ actions were clearly speculative, and a textbook example of what the legislature intended to prevent in enacting Article 124. As a result, we find the trial court had a substantial factual basis for finding the lease expired as to Sections 9, 10, 16, and 21 for failure to produce in paying quantities.
We acknowledge Tauren’s argument that the trial court erred in finding the lease was terminated as to the deep rights, because the Gloria’s Ranch 16-1 was drilled in bad faith.[10] However, we find the issue is moot due to the expiration of the lease as to Sections 9, 10, 16, and 21 for failure to produce in paying quantities. The lease provided that “[it] may be maintained during and after the primary term by production of oil and gas therefrom[.]” When a mineral lease is being maintained by production of oil and gas, Article 124 requires the production to be in paying quantities. As such, even if we concluded the trial court was clearly wrong in finding the Gloria’s Ranch 16-1 was drilled in bad faith, the lease cannot be maintained - to any depth in Sections 9, 10, 16, and 21 without production in paying quantities. Therefore, the issue is pretermitted.
1 uLost-Leasing Opportunities Award,
Next, Tauren argues the trial court erred in awarding $18,000 per acre for lost-leasing opportunities. As acknowledged by the trial court, there was a plethora of evidence presented at trial as to the value of Gloria’s Ranch’s leasing opportunities at the time Gloria’s Ranch demanded release from the lease. Gloria’s Ranch presented the expert testimony of *1214 Paul Jarratt (“Jarratt”), a petroleum land-man, who determined Gloria’s Ranch’s property could have commanded around $23,000 per acre at the time it demanded release from the lease. Jarratt arrived at this number by using SONRIS to analyze mineral leases granted by the state through the public bidding process.[11]
Jarratt considered the $18,000 per acre EXCO paid Tauren in November 2009 for only a 51% deep rights interest in the lease. On March 18, 2011, EXCO sent a letter to Tauren and Cubic regarding the lawsuit filed by Gloria’s Ranch (“EXCO letter”). In the letter, EXCO included a list of the damages it would suffer as a result of the lawsuit, including the loss of the lease, as to Sections 9, 10, 16, and 21, valued at $18,000 per acre. Jarratt testified the EXCO letter is the best evidence of the value of Gloria’s Ranch’s leasing opportunities at the time it demanded release.
| ^McGowen, Gloria’s Ranch’s petroleum expert, was experienced in valuating mineral leases, particularly from the Haynes-ville Shale. McGowen determined Gloria’s Ranch could have leased its property for at least $18,000 per acre in March 2010. In making this determination, he evaluated Jarratt’s report and considered the EXCO letter. McGowen agreed that the EXCO letter provided the best indication of the value of Gloria’s Ranch’s leasing potential, because $18,000 per acre was comparable to what he was familiar with around Gloria’s Ranch’s property.
Foster Holley (“Holley”), a landman who presented expert testimony for the defendants, testified he began acquiring Haynesville leases on behalf of Chesapeake in 2008. Holley created a report which included a schedule of all the leases he negotiated for Chesapeake between December 2009 and April 2010. Holley’s report indicated the average lease bonus was $6,956.12 per acre. Notwithstanding, he testified that because Gloria’s Ranch’s property was outside the core of the Haynesville Shale, it would have commanded a lease bonus of only $4,637 per acre. Holley asserted the production rates of properties around Gloria’s Ranch were one-third less than the production rates of leases on Holley’s schedule.
Despite Holley’s assertion that Gloria’s Ranch’s property was outside the core of the Haynesville Shale, evidence was introduced to show otherwise. Furthermore, Holley’s report only included lease bonuses from leases in DeSoto and Sabine Parishes (Gloria’s Ranch is in Caddo Parish), and many of the leases included in Holley’s report were for fractional mineral interests as opposed to large tracts of land like Gloria’s Ranch’s property. Holley admitted that large tracts of land were more valuable to |, Jessees and commanded larger bonuses, because comprehensive mineral interests allow lessees operational control over the drilling units.
Based on the evidence presented at trial, we find a factual basis for the trial court awarding Gloria’s Ranch $18,000 per acre in lost-leasing opportunities. The trial *1215 court had two expert witnesses testify the EXCO letter valuing Gloria’s Ranch’s lease at $18,000 per acre was the best evidence of the value of Gloria’s Ranch’s leasing opportunities at the time it demanded release. Jarratt testified that Gloria’s Ranch could have received a lease bonus as high as $23,000 per acre, and McGowen testified that a lease bonus that high would not have surprised him. As a result, the trial court did not abuse its discretion.
Additionally, Tauren argues the trial court failed to deduct the amount Gloria’s Ranch received by virtue of the EXCO settlement from the lost-leasing opportunities award. As discussed below, the trial court properly deducted Gloria’s Ranch’s damage awards and attorney fees by 25% to account for the EXCO settlement, and the defendants are not entitled to an additional reduction based on the amount of money Gloria’s Ranch received from the settlement. Farbe v. Cas. Reciprocal Exch., 2000-0076 (La. 07/06/00), 765 So.2d 994, 997 (“Louisiana courts do not look to the settlement amount received by a plaintiff when determining the credit granted to the remaining solidary obligors”).

Application of Louisiana Mineral Code Article H0

Tauren argues the trial court erred in awarding Gloria’s Ranch a total award of $726,087.78 ($242,029.26 for the unpaid royalties and $484,058.52 as a penalty for failure to pay the royalties) for the defendants’ failure to pay royalties on the Soaring Ridge 15H. According to Tauren, La. R.S. 31:140 117(“Article 140”) does not authorize an award of treble damages, because the damage award contemplated by that article includes the unpaid royalties. Thus, Tauren asserts the maximum award allowed under the statute was $484,058.52 ($242,029.26 for the unpaid royalties and $242,029.26 as a penalty for failure to pay the royalties).
The interpretation of a statute is a question of law subject to de novo review. Transpetco I Joint Venture v. Clearview Inv., Ltd., 48,987 (La.App. 2 Cir. 05/14/14), 139 So.3d 49, 55. Consequently, the manifest error standard of review is not applicable and we review the interpretation of Article 140 de novo. Article 140 provides:
If the lessee fails to pay royalties due or fails to inform the lessor of a reasonable cause for failure to pay in response to the required notice, the court may award as damages double the amount of royalties due, interest on that sum from the date due, and a reasonable attorney’s fee regardless of the cause for the original failure to pay royalties. The court may also dissolve the lease in its discretion. (Emphasis supplied.)
In Wegman v. Cent. Transmission, Inc., 499 So.2d 436, 451 (La. App. 2 Cir. 1986), writ denied, 503 So.2d 478 (La. 1987), this court held that the correct method for awarding damages under Article 140 is to award the amount of royalties due in addition to a separate damage award of twice the amount of royalties. See also Cimarex Energy Co. v. Mauboules, 2008-452 (La. App. 3 Cir. 03/11/09), 6 So.3d 399, 407, rev’d on other grounds, 2009-1170 (La. 04/09/10), 40 So.3d 931.[12]
hsAfter reviewing the Mineral Code, we agree with Wegman’s interpretation of Ar- *1216 tide 140.[13] First, the damage award authorized in Article 140 is a discretionary award, and allowing the trial court discretion in awarding the actual royalties due would produce consequences surely not intended by the legislature. Secondly, the Mineral Code includes other statutes with similar language to Article 140, including La. R.S. 81:139 (“Article 139”). Under Article 139, when a lessee pays the royalties due after receiving notice of nonpayment from the lessor, the trial court “may award as damages double the amount of royalties due,” if the original failure to pay was either fraudulent or willful and without reasonable grounds. Thus, the phrase “damages double the amount of royalties due” in Article 139 strictly pertains 'to punitive damages and excludes the. actual royalties due. In keeping with the spirit of Article 139, we find the legislature enacted Article 140 to provide the trial court with the option of awarding punitive damages totaling up to double the amount of royalties due for the lessee’s failure to.pay the royalties. As a result, the trial court-.was within its discretion in awarding Gloria’s Ranch $242,029.26 in unpaid royalties, plus an additional $484,058.52 in punitive damages for the defendants’ failure to pay the, royalties..
^JjflCubic’s Assignment of Error

Cancellation of the Lease as to Section 15

Cubic argues the trial court’s judgment improperly declared the lease “expired” and “cancelled,” without excluding the 80 acres in Section-15 that did not terminate for lack of production in paying quantities. According to Cubic, the trial court did nót cancel the lease as to Section 16 for failure to pay royalties, but only awarded Gloria’s Ranch unpaid royalties and penalties. Cubic requests this court modify the judgment to provide that the lease is not cancelled as to Section 15,
Appeals are taken from the judgment, not the written reasons for judgment. La. C.C.P. arts. 2082, 2083; Greater New Orleans Expressway Com’n v. Olivier, 2002-2795 (La. 11/18/03), 860 So.2d 22; Hofler v. J.P, Morgan Chase Bank, N.A., 46,047 (La.App. 2 Cir. 01/26/11), 57 So.3d 1128, 1134. A judgment and reasons for judgment are two separate and distinct documents; it is well-settled law that the trial court’s oral or written reasons form no part of the judgment. La. C.C.P. art. 1918; Burnmaster v. Plaquemines Parish Gov't, 2010-2127 (La. 09/22/10), 45 So.3d 1061. Written reasons for judgment are merély an explication of the trial court’s determinations; they do not alter, amend, or affect the final judgment. Wooley v. Lucksinger, 2009-0571 (La. 04/01/11), 61 So.3d 507, 572. If there is a conflict between the two, the trial court’s signed judgment prevails over the reasons for judgment. Hofler, supra, Tfiis allows a signed final judgment to take precedence over substantive misstatements because a *1217 final judgment is usually prepared with care, may be revised before it is signed, and the aggrieved party has recourse to a timely application for a new trial or timely appeal. Hebert v. Hebert, 351 So.2d 1199 (La. 1977); Hofler, supra.
|2nThe trial court’s judgment declared the lease “expired” and “canceled” without excluding Section 15. In its oral reasons for judgment, the trial court found only Sections 9, 10, 16, and 21 had expired for failure to produce in paying quantities. As for Section 15, the trial court awarded Gloria’s Ranch unpaid royalties and penalties for the defendants’ failure to pay the royalties, but it did not order the cancellation of the lease. Louisiana law provides when there is a discrepancy between a trial court’s written reasons for judgment and its final judgment, the latter must prevail. Hofler, supra. Consequently, for this court to reverse the trial court’s judgment, the record must .not support the cancellation of the lease as to Section 15.
When a mineral lessor seeks relief for the failure of his lessee to make timely or proper payment of royalties, he is required to give his lessee written notice of such failure as a prerequisite to a judicial demand for damages or dissolution of the lease. La. R.S. 31:137. After such written notice, the lessee has within 30 days of receiving notice to either pay the royalties or respond by stating in writing a reasonable cause of nonpayment. La. R.S. 31:138. As noted above, if the lessee fails to pay royalties due or fails to inform the lessor of a reasonable cause for failure to pay in response to the required notice, the trial court may award as damages double the amount of royalties due. La. R.S. 31:140. The trial court also has the option to dissolve the lease; however, dissolution should be granted only if the conduct of the lessee, either in failing to pay originally or in failing to pay in response to the required notice, is such that the remedy of damages is inadequate to do justice. La. R.S. 31:141.
A few months after Gloria’s Ranch demanded release from the lease, Lepow, a member and manager for Gloria’s Ranch, contacted Chesapeake Li about the unpaid royalties. Lepow stated SONRIS showed Chesapeake’s Soaring Ridge 15H had been producing since summer 2008, but Gloria’s Ranch had yet to receive any payments from the well’s production. After Lepow asked when Gloria’s Ranch would begin receiving payments, Chesapeake replied that Tauren and Cubic were already receiving payments from the'well’s production and Lepow needed to contact them about the unpaid royalties. After providing notice of the unpaid royalties to the defendants, Lepow testified Gloria’s Ranch received neither any royalty payments from the defendants, nor a response explaining why the royalties had not been paid, Ross, the executive vice-president of Cubic, testified the defendants opted not to respond to Gloria’s Ranch’s demand for royalties because “we were already being sued.”
It is within the trial court’s discretion to dissolve a lease for a lessee’s failure to pay royalties. La. R.S. 31:140. The Soaring Ridge 15H began producing in November 2008, almost two years before Gloria’s Ranch filed suit against the defendants and approximately four years before Gloria’s Ranch notified the defendants of their failure to pay royalties. The record indicates the defendants knew they were obligated to pay royalties on the Soaring Ridge 15H’s production but opted not do so. Not only did the defendants fail to pay the royalties due, but they also failed to provide Gloria’s Ranch with any response whatsoever. Considering these facts, there is a factual basis for the trial court to find damages alone were insufficient to compensate Gloria’s Ranch for the defendants’ *1218 conduct, and we affirm the cancellation of the lease as to Section 15.
122Wells Fargo and Tauren’s Assignment of Error

In Solido Liability

Wells Fargo and Tauren challenge the trial court finding them solidarily liable with the remaining defendants for Gloria’s Ranch’s damages. On January 28, 2010, Gloria’s Ranch sent a letter requesting a recordable act evidencing the expiration of the lease for failure to produce in paying quantities. This letter was addressed to Tauren, Cubic, EXCO, and Wells Fargo. At that time, Tauren owned a 51% undivided interest in the shallow rights, EXCO owned a 51% undivided interest in the deep rights, and Cubic owned a 49% undivided interest in the shallow and deep rights. Wells Fargo held a mortgage over Cubic’s interest in the lease, as well as an overriding royalty and net profits interest in the lease.
An obligation is a legal relationship whereby a person, called the obligor, is bound to render a performance in favor of another, called the obligee. Performance may consist of giving, doing, or not doing something. La. C.C. art. 1756. When different obligors owe together just one performance to one obligee, but neither is bound for the whole, the obligation is joint for the obligors. La. C.C. art, 1788. An obligation is indivisible when the object of the performance, because of its nature or because of the intent of the parties, is not susceptible of division. La. C.C. art. 1815. When a joint obligation is indivisible, joint obligors are subject to the rules governing solidary obligors. La. C.C. art. 1789.[14] Solidarity of obligation shall not be presumed. A solidary obligation arises from a clear expression of the parties’ intent or from the law. La. C.C. art. 1796. When Indistinct obligors owe the same indivisible performance to one obligee, they are soli-darily bound to that obligee, regardless of their intentions. La. C.C. art. 1818, Comment (b). Whether or not a defendant is solidarily liable is subject to manifest error review. See Corbello v. Iowa Prod., 2002-0826 (La. 02/25/03), 850 So.2d 686, 703, as clarified on reh’g (06/20/03); Louisiana Safety Ass’n of Timbermen Self Insurers Fund v. Courtney Const. Co. of Alexandria, Inc., 41,564 (La.App. 2 Cir. 12/13/06), 949 So.2d 490, 500, writ denied, 2007-0443 (La. 04/27/07), 955 So.2d 687.
A mineral lease is a contract by which the lessee is granted the right to explore for and produce minerals. La. R.S. 31:114. A mineral lease conveys rights to explore and develop, to produce minerals, to reduce them to possession, and to assert title to a specified portion of the production. La. R.S. 31:16, comment. The lessee’s interest in a mineral lease, like any other “thing,” is susceptible of co-ownership. La. R.S. 31:168, comment. For co-ownership of a mineral lease to exist, it must be established that two or more mineral lessees own undivided fractional interests in the same mineral lease. Id. The extent of a mineral lessee’s leasehold interest in a tract or subsurface geological stratum thereunder is known as an “operating” or “working” interest in the lease. The owner of a working interest in a lease has the exclusive right to exploit the minerals on the land. 8 Williams & Meyers, Oil and Gas Law, Manual of Terms, p. 1155 (2016); see Pinnacle Operating Co., Inc. v. Ettco Enters., Inc., 40,367 (La.App. 2 Cir. 10/26/05), 914 So.2d 1144.
*1219 | ¾When a mineral right[15] is extinguished by the accrual of liberative prescription, expiration of its term, or otherwise, La. R.S. 31:206 (“Article 206”) requires the former owner of the mineral right to furnish a recordable act evidencing the expiration of the right within 30 days of receiving a written demand from the person in whose favor the right has been extinguished. If the former owner of the expired mineral right fails to furnish the required act within 30 days, he is liable to the person in whose favor the right or the lease has been extinguished or expired for all damages resulting therefrom and for reasonable attorney fees incurred in bringing suit. La. R.S. 31:207 (“Article 207”). The right to secure damages and attorney fees under Article 207 is applicable also to a demand for dissolution of a mineral lease for failure to comply with its obligations. La. R.S. 31:209. Whether or not a defendant is a “former owner” of the lease is a mixed question of law and fact subject to manifest error review. See Armenia Coffee Corp. v. Am. Nat. Fire Ins. Co., 2006-0409 (La.App. 4 Cir. 11/21/06), 946 So.2d 249, 253, writ denied, 2006-2983 (La. 02/16/07), 949 So.2d 422.
Since Tauren held a 51% working interest in the shallow rights of the lease, it is clearly a former co-owner of the lease. As a former co-owner of the lease, Tauren was obligated to provide Gloria’s Ranch with a recordable act evidencing the expiration of its interest in the lease.
Regarding solidary liability, Tauren argues it should only be responsible for Gloria’s Ranch’s damages relating to the shallow rights in the lease and not the deep rights in the lease. We disagree. Gloria’s Ranch ^demanded release from the entire lease for failure to produce in paying quantities, which included both the shallow and deep rights in the lease. Jarratt testified that if any party who held an interest in the lease failed to release its interest, it would create a cloud on the title that would discourage potential lessees from executing a new lease with Gloria’s Ranch. Furthermore, La. R.S. 31:168 provides that the ownership of a mineral right, such as a mineral lease, is indivisible. Thus, the obligation of the owners of the lease to produce a recordable act evidencing the release of the lease was indivisible, and the trial court correctly found Tauren solidarily liable with the remaining defendants.
As for Wells Fargo, the trial court found it solidarily liable with the remaining defendants for four reasons: 1) Wells Fargo’s mortgage on Cubic’s interest in the lease contained an assignment of the lease; 2) Wells Fargo’s mortgage on Cubic’s interest in the lease provided that Cubic could not release the lease without prior consent from Wells Fargo; 3) Wells Fargo had an overriding royalty and net profits interest in the lease; and 4) Wells Fargo received cost information from Tauren and Cubic and regularly audited their records.
First, we address the trial court’s conclusion that Wells Fargo’s mortgage with Cubic contained an assignment of the lease. Gloria’s Ranch argues the Cubic mortgage included a collateral assignment of the lease. Wells Fargo contends it received only a security interest in the lease. The general rules of contract interpretation apply when interpreting contracts involving mineral rights. Hoover Tree Farm, L.L.C. v. Goodrich Petroleum Co., L.L.C., 46,153 (La.App. 2 Cir. 03/23/11), 63 So.3d 159, 167, writs denied, 2011-1225 (La. 09/23/11), 69 So.3d 1161 and 2011-1236 (La. *1220 09/23/11), 69 So.3d 1162. When a contract may be interpreted from the four corners of the agreement, without consideration of extrinsic evidence, the interpretation is a matter of law subject to de novo review. Hoover, supra; Reg’l Urology, L.L.C. v. Price, 42,789 (La.App. 2 Cir. 09/26/07), 966 So.2d 1087, 1092, writ denied, 2007-2251 (La. 02/15/08), 976 So.2d 176.
The purpose of contract interpretation is to determine the common parties’ intent. La. C.C. art. 2045; Hoover, supra. The reasonable intention of the parties to a contract is to be sought by examining the words of the contract itself, and not assumed. Prejean v. Guillory, 2010-0740 (La. 07/02/10), 38 So.3d 274, 279. The words used in a contract are to be given their generally prevailing meaning unless they are words of art or have acquired a technical meaning. La. C.C. art. 2047. When the words of a contract are clear, explicit, and lead to no absurd consequences, then no further interpretation may be made in search of the parties’ intent. La. C.C. art, 2046. However, even when the language of the contract is clear, courts should refrain from construing the contract in such a manner as to lead to absurd consequences. Clovelly Oil Co., LLC v. Midstates Petroleum Co., LLC, 2012-2055 (La. 03/19/13), 112 So.3d 187, 192. When the words of a contract are susceptible of different meanings, they must be interpreted as' having the meaning that best conforms to' the object of the contract. La. C.C. art. 2048, Each provision in a contract must be interpreted in light of the other provisions so that each is given the meaning suggested by the contract as a whole. La. C.C, art. 2050.
An assignment ⅛ the transfer of some identifiable property, claim, or right from the assignor to the. assignee. See 6A C.J.S., Assignments § 2 (2017). In La. C.C. art, 3506(5), “[a]ssigns means those to whom rights have been transmitted by particular title; such as sale, donation, legacy, transfer or cession.” Furthermore, an assignment of right, the transfer of credits and other incorporeal rights, is a species of sale and is treated as such in our Civil Code. Hoover, supra; Sanson Four Rentals, L.L.C. v. Faulk, 35,417 (La.App. 2 Cir. 12/19/01), 803 So.2d 1048, 1052. This court has previously stated that the .assignment of a mineral lease occurs when “the assign- or transfers his entire interest in the lease in so far as it affects the property on which the lease is assigned.” Hoover, supra (quoting Roberson v. Pioneer Gas Co., 173 La. 313, 319, 137 So. 46, 48 (1931)).
We begin ,our review of the Cubic mortgage by stating the “Assignment” clause is clearly a collateral assignment of the proceeds from the oil and gas production on the lease. The Assignment clause provides in pertinent part:
2.03 Assignment.. To further secure the full and punctual payment and performance of all present and future Indebtedness, up to the maximum amount outstanding at any time... Mortgagor does hereby absolutely, irrevocably and unconditionally pledge, pawn, assign, transfer and assign to Mortgagee all monies which accrue after 7:00 a.m. Central Time... to Mortgagor’s interest in the Mineral Properties and all present and • future rents therefrom... and all proceeds of the Hydrocarbons.. . and of the products obtained, produced or processed from or attributable to the Mineral Properties[16] now or hereafter *1221 (which monies, rents and proceeds are referred herein as the “Proceeds of Runs”). Mortgagor hereby authorizes and directs all obligors of any Proceeds of Runs to pay and deliver to Mortgagee, upon request therefor by Mortgagee, all of the Proceeds of Runs., .accruing to Mortgagor’s interest[.] (Emphasis in original)
l2sln accordance with the Mineral Code, the right to conduct oil and gas operations on the'lessor’s property and the right to share in the proceeds from such operations are two distinct mineral rights. See La. R.S. 31:16. Pursuant to the Assignment clause, Cubic transferred to Wells Fargo its right to the proceeds derived from its interest in the lease. However, Wells Fargo did not become an owner of the lease itself as a result of the clause, because the clause did not include an assignment of Cubic’s working interest" in the lease, i.e., the right to use Gloria’s Ranch’s property to explore for and produce minerals.
At trial, Gloria’s Ranch stressed that the use of the word “assign” in the “Hypothec cation” clause proves the mortgage included an assignment of the lease. Conversely, when Ross was asked if-the Hypothecation clause in the mortgage constituted an assignment of the lease,, he responded that the provision was only a collateralization of the lease. The Hypothecation clause in the Gubic mortgage provides in pertinent part:
2.01 Hypothecation, (a) In order to secure the full and punctual payment and performance of all present future Indebtedness, the Mortgagor does by these presents specially mortgage, affect, hypothecate, pledge, and assign unto and in favor of Mortgagee, to inure to the use and benefit of Mortgagee, the following described property, to-wit:
(1) The Mineral Properties, together with all rents, profits, products and proceeds, • whether now or hereafter existing or arising, from the Mineral Properties!)] (Emphasis in original)
The use of the words “assign” and “assignment” in an instrument does not mandate a finding that the instrument included an assignment. Instead, a court should look to the intent of the parties to determine the nature of the transaction. See Hoover, supra; Cadle Co. v. Dumesnil, 610 So.2d 1063, 1069 (La. App. 3 Cir. 1992), writ denied, 613 So.2d 992 (La. 1993); Colonial Fin., Serv., Inc. v. Stewart, 481 So.2d 186, 189 (La. App. 1 Cir. 1985); Smith v. Sun Oil Co., 165 La. 907, 911, 116 So. 379, 380 (1928) (In the conveyance of a mineral lease, the use of the' words “grant, convey, transfer and assign, did not, of itself, make the contract an assignment merely, or deprive it of the character of a sublease; for there were several stipulations in the contract which made it, essentially, a sublease, and not merely an assignment.”).
A mortgage is a nonpossessory* right created over property to secure the performance of an obligation. La. C.C. art. 3278. A mortgage gives the mortgagee neither title nor the right of possession of the property. Poland v. Poland, 34,085 (La. App. 2 Cir. 12/06/00), 779 So.2d 852, 856. A mortgage gives the mortgagee, upon failure of the obligor to perform the obligation that the mortgage secures," the right to cause the property to be seized and sold in the manner provided by law and to have the proceeds applied toward the satisfaction of the obligation in preference to claims of others. Pursuant to La. C.C. art. 3286, a lessee’s rights in a lease of an immovable are susceptible of-mortgage. A *1222 mineral right is susceptible of mortgage to the same extent and with the same effect, and subject to the same extinguishment, transfer, and enforcement as is prescribed by law for mortgages of immovables. La. R.S. 31:203.
In addition to the word “assign,” the Hypothecation clause in the Cubic mortgage contains the words “hypothecate,” “affect,” and “pledge.” Black’s Law Dictionary (West, 10th ed. 2014) defines “hy-pothecation” as the “pledging of something as security without delivery of title or possession,” “affect” as “to pledge (property or revenues) as security for ajaban,” and “pledge” as the “act of providing something as security for a debt or obligation.”
The Cubic mortgage also includes the following provisions:
2.02 The Security Interests. In order to secure the full and punctual payment and performance of all present and future Indebtedness, Mortgagor hereby grants to Mortgagee a continuing security interest in and to all right, title and interest of Mortgagor in, to and under the following property, whether now owned or existing or hereafter acquired or arising and regardless of where located:
(1) The Mineral Properties
[[Image here]]
5.02 Remedies.
* * *
(b) Upon the occurrence of any Event of Default, Mortgagee may take such action, without notice or demand, as it deems advisable to protect and enforce its rights against Mortgagor and in and to the Collateral...
* * *
5.05 Sale. Upon the occurrence of an Event of Default, Mortgagee may exercise all rights of a secured party under the UCC and other applicable law.. .and, in addition, Mortgagee may, without being required to give any notice, except as herein provided or as may be required by mandatory provisions of law, sell the Collateral or any part thereof at public or private sale, for cash, upon credit or future delivery, and at such price or prices as Mortgagee may deem satisfactory. Mortgagee may be the purchaser of any or all of the Collateral so sold at any public sale... Upon any such sale, Mortgagee shall have the right to deliver, assign and transfer to the purchaser thereof the Collateral so sold[.] (Emphasis in original)
Since the Cubic mortgage does not include the transfer of Cubic’s working interest in the lease, the mortgage did not include an assignment of the lease. The language of the mortgage shows the purpose of the instrument was for Cubic to secure its loans with Wells Fargo by granting Wells Fargo a continuing security interest in multiple mineral leases, which I .^included Gloria’s Ranch’s lease. In the event Cubic defaulted on its loans, the mortgage gave Wells Fargo the right to seize and sell the lease to satisfy the debt. As such, we find the use of the word “assign” in the Hypothecation clause does not deprive the mortgage of its character, which is “to secure the full and punctual payment and performance of the Indebtedness.”
Additionally, Gloria’s Ranch asserts Wells Fargo is solidarily liable because it owned or controlled the bundle of rights that make up ownership, i.e., the rights to use, enjoy, and dispose of the lease. Ownership is the right that confers on a person direct, immediate, and exclusive authority over a thing. The owner of a thing may use, enjoy, and dispose of it within the limits and under the conditions *1223 established by law. La. C.C. art. 477. Ownership under the civil law conveys three rights to the owner of the thing: usus, or the right to use; fructus, or the right to the fruits; and abusus, or the right to dispose of. Giroir v. Dumesnil, 248 La. 1037, 184 So.2d 1, 6 (1966).
Wells Fargo did not own a working interest in the lease. However, Wells Fargo did exercise control over Cubic’s right to conduct oil and gas operations on the property. The credit agreement between Wells Fargo and Cubic directed the loan proceeds be used to repay debts and develop Cubic’s oil and gas properties, including reimbursing or paying itself for the costs associated with drilling three wells into the Cotton Valley or Haynesville Shale formations on Gloria’s Ranch’s property. Wells Fargo retained the right to approve the location and depth of the wells. Wells Fargo also directed Cubic to perform specific workovers and completions on other properties collateralized in the mortgage. Furthermore, Cubic was required to provide Wells Fargo with quarterly and annual financial statements | ^reflecting Cubic’s financial condition, reserve reports showing projections of future net income from its properties, and sales and production reports which included the actual revenue and operating expenses of the wells. Pursuant to the Cubic mortgage, Wells Fargo had the right to access Gloria’s Ranch’s property “at all times,” and Cubic could not enter into new operating agreements or amend the existing operating agreement without written consent from Wells Fargo.
As for the rights to enjoy and alienate the lease, Wells Fargo received an assignment of the proceeds from Cubic’s interest in the lease, and pursuant to transactions with Tauren, acquired overriding royalty[17] and net profits[18] interests in the lease. As a result, Wells Fargo owned the right to share in the production of the lease. Notably, Wells Fargo controlled Cubic’s ability to alienate its interest in the lease by requiring Cubic to obtain its written consent to release the lease. Lepow testified that he emailed Ross in summer 2008 about releasing the lease for failure to produce in paying quantities. Ross responded to Lepow by stating, among other things, that he could not release Cubic’s interest in the lease because it was collat-eralized in Cubic’s credit facility with Wells Fargo.
It is not the duty of this court to determine whether the trial court was right or wrong, but whether the trial court’s conclusion was a reasonable one. Hayes, supra. Based on the record as a whole, we find the trial court [aahad a legitimate factual basis for finding Wells Fargo solidarily liable with the remaining defendants. La. C.C. art. 1797 provides that “[a]n obligation may be solidary though it derives from a different source for each obligor.” “It is the coextensiveness of the obligations for the same debt, and not the source of liability, which determines the solidarity of the obligation.” Glasgow v. PAR Minerals Corp., 2010-2011 (La. 05/10/11), 70 So.3d 765, 772; Stonecipher v. Mitchell, 26,575 (La.App. 2 Cir. 05/10/95), 655 So.2d 1381, 1386. Jarratt testified that the Cubic mortgage was a “very sophisticated financial instrument” which conveyed certain rights in the lease *1224 to Wells Fargo. Jarratt asserted Wells Fargo’s interests in the lease would create red flags for potential lessees. Wells Fargo exercised control over Cubic’s oil and gas operations on the lease, and controlled Cubic’s ability to release the lease for failure to produce.in paying quantities. As such, Wells Fargo shared coextensive liability with Cubic to provide a recordable act evidencing the release of its interest in the lease, and we discern no manifest error in the trial court finding Wells Fargo solidar-ily liable with the remaining defendants.[19]
Gloria’s Ranch’s Answer

Attorney Fees

By answer to appeal, Gloria’s Ranch requests attorney fees for work | .^performed during the trial and appellate court levels. Gloria’s Ranch states it has incurred $108,833.51 in costs and fees from trial until final judgment was rendered, and an additional $244,532.68 from final judgment through appeal.
As a general rule, attorney fees are not allowed in Louisiana unless they are authorized by statute or provided for by contract. Langley v. Petro Star Corp. of La., 2001-0198 (La. 06/29/01), 792 So.2d 721, 723. An award of attorney fees is a type of penalty imposed not to make the injured party whole, but rather to discourage a particular activity on the part of the opposing party. Id, Pursuant to La. R.S. 31:207, in a suit to cancel an oil and gas lease on grounds that the primary term had terminated, a lessor is entitled to recover reasonable attorney fees where the lessee refused to release the expired lease upon demand. Moreover, a lessor is entitled to recover reasonable attorney fees in a suit to dissolve an oil and -gas lease on grounds that the lessee failed to comply with its obligations. La. R.S, 31:209.
An award of attorney fees must be reasonable, based upon the degree of skill and work involved in the case, the number of court appearances, the depositions, and the 'office work involved. Linoski v. Fleetwood Homes of Texas, # 12, 38,338 (La. App. 2 Cir. 05/12/04), 873 So.2d 886, 888; Gaston v. Bobby Johnson Equip. Co., Inc., 34,028 (La.App, 2 Cir. 11/03/00), 771 So.2d 848. The trial court awarded Gloria’s Ranch $925,603 in pretrial attorney fees and expert costs, and. $11,200 in attorney fees incurred during trial. We find the trial court’s awards were sufficient to compensate counsel for work done at the .trial level.
|arAs for .additional attorney fees for work done on appeal, the general rule is that an increase in attorney fees is usually allowed where a party was awarded attorney fees by tjje trial court and is forced to and successfully defends an appeal. However, even though requested, additional attorney fees may not be granted where the appellate court finds that the amount .awarded in the trial court was sufficient to compensate counsel for both the work at the trial and appellate court *1225 levels. Family Care Servs., Inc. v. Owens, 45,505 (La.App. 2 Cir. 08/11/10), 46 So.3d 234, 244.
After reviewing the record, we acknowledge the diligence, tenacity, and expertise required by Gloria’s Ranch’s attorneys in successfully defending the trial court’s judgment. Notably, Wells Fargo did not hire separate counsel until after final judgment had been rendered, and as a result, Gloria’s Ranch’s attorneys were forced to vehemently defend Wells Fargo’s solidary liability on motion for new trial and appeal. Considering the length and complexity of this 19-volume case, Gloria’s Ranch is entitled to $125,000 in additional attorney fees for work done on appeal,
CONCLUSION
For the foregoing reasons, the trial court’s November 23, 2015 judgment is affirmed. We award Gloria’s Ranch, L.L.C., additional attorney fees in the amount of $125,000. We note this case is highly fact-intensive and should not be construed as governing other cases that may follow unless the same facts exist. Costs of this appeal are assessed to the appellants, Tauren Exploration, Inc., Cubic Louisiana, L.L.C., and Wells Fargo Energy Capital, Inc.
AFFIRMED AND ADDITIONAL ATTORNEY FEES AWARDED.

.The vertical Pugh clause in the lease provided:
In the event a portion or portions of the land described in this lease are pooled or unitized with other lands, lease or leases so as to form a pooled unit or units, drilling operations or production from the unitized premises shall maintain this lease only as to that portion of the leased premises within such unit or units, and, as to that portion of the leased premises not included in such unit or units, this lease may be maintained during and after the primary term by production of oil and gas therefrom or in any other manner provided for in this lease. The horizontal Pugh clause in the lease provided in pertinent part that: “At the end of the primary term or extension thereof, this lease shall terminate and be of no force and effect 100 feet below the total depth drilled in any well drilled on the leased premises or on lands pooled therewith.”

. Wells Fargo provided revolving advances to Cubic after receiving borrowing requests.

. Cubic executed two promissory notes evidencing both loans.

. Tauren’s credit agreement and mortgage with Wells Fargo are not included in the record.

. Both Tauren and Fossil are wholly owned by Calvin Wallen, III (‘‘Wallen”), He is also the chief executive officer and president of Cubic.

. In Barham v. St. Mary Land & Expl. Co., 48,603 (La.App. 2 Cir. 11/20/13), 129 So.3d 705, 709, writ denied, 2013-2943 (La. 02/21/14), 134 So.3d 586, this court defined top leases as follows:
Top leases are leases granted by landowners during the existence of another mineral lease that become effective if and when the existing lease expires or is terminated. As a legal right, the top lease exists at its inception as a mere' hope or expectancy in the extinction of existing superior leasehold rights, which extinction will confer upon the top lease owner the essence of a mineral lease, i.e., the right to explore for and produce minerals. (Citations omitted.)

. - No damages were awarded for Section 21, because of the top lease Gloria’s Ranch granted Chesapeake.

. On December 11, 2015, Cubic filed for bankruptcy. The effective date of the bankruptcy judgment was March 1, 2016, and Cubic Louisiana, L.L.C. was substituted for Cubic as defendant in this case.

. A processing facility is necessary to produce and sell the hydrocarbons from the wells.

. Ron Lepow ("Lepow”), the manager of Gloria's Ranch, testified that Tauren commenced operations to complete the Gloria’s Ranch 9-1, 10-1, and 16-1 in June or July of 2007; coincidentally, the primary term of the lease ended in September 2007. The lease contained a horizontal Pugh clause which provided in pertinent part: "[a]t the end of the primary term or any extension thereof, this lease shall terminate and be of no force and effect 100 feet below the total depth drilled in any well drilled on the leased premises or on lands pooled therewith^.]" Thus, Tauren’s decision to drill the 16-1 to the Haynesville Shale formation but complete it in the Cotton Valley formation was arguably an attempt to preserve the deep rights in the lease before the deep rights were terminated pursuant to the horizontal Pugh clause.

. In a report of his findings, Jarratt included the lease bonuses for all Haynesville leases awarded by the state in Bossier, Caddo, De-Soto, and Red River Parishes, between November 2009 and April 2010. Jarratt testified that state leases are one-year leases with the option to extend the lease for another year for a rental price of 50% of the lease bonus. Jarratt converted every state lease included in his report to three-year leases, which is the customary term for private leases. For example, if SONRIS showed the winning bid for a lease granted by the state was a $10,000 per acre lease bonus, Jarratt converted the lease bonus to $20,000 per acre. Thereafter, Jarratt determined the average lease bonus for three-year state leases between November 2009 and April 2010 was $23,112 per acre.

. In Cimarex, supra, the trial court awarded unpaid royalties of approximately $3.2 million dollars, plus $6.4 million dollars in statutory damages, pursuant to La. R.S, 31:212,23(C), which provides that if an obligor fails to pay royalties due without reasonable cause, the trial court “may award as damages double the amount due.” On appeal, the third circuit found the unpaid royalties were not damages, but merely money owed to the obligee as the owner of the royalty interests. Citing this court’s opinion in Wegman, the third circuit concluded that in addition to owing the unpaid royalties, the obligor would pay an additional sum as damages to the obligee.

. The meaning and intent of a law is' determined by considering the law in its entirety and all other laws concerning the same subject matter and construing the provision in a manner that is consistent with the express terms of the statute and. with the obvious intent of the lawmaker in enacting it, The statute must therefore be applied and interpreted in a manner that is-logical and consistent with tile presumed fair purpose and intention the Legislature had in enacting it. Sultana Corp. v. Jewelers Mut. Ins. Co., 2003-0360 (La. 12/03/03), 860 So.2d 112, 1115. Furthermore, “the object of the court in construing a statute is to ascertain the legislative intent and, where a literal interpretation would produce absurd consequences, the letter must give way to the spirit of the law and the statute construed so as to producé a reasonable result." Sultana, supra (quoting Smith v. Flournoy, 238 La. 432, 115 So.2d 809, 814 (1959)).

. An indivisible obligation with more than one obligor or obligee is subject to the rules governing solidary obligations. La. C.C. art. 1818.

. La. R.S. 31:16 provides: "The basic mineral rights that may be created by a landowner are the mineral servitude, the mineral royalty, and the mineral lease.”

. . "Mineral Properties” is defined in the mortgage as "all of Mortgagor's right, title and interests in the oil, gas, and mineral leases, mineral servitudes, subleases, farm- ■ outs, royalties, overriding royalties, net profits interests, production payments, operating rights and similar mineral interests and sub *1221 leases and assignments of such mineral interest[s].”

. “An interest in oil and gas produced at the surface, free of the expense of production, and in addition to the usual landowner’s royalty reserved to the lessor in an oil and gas lease.” 8 Williams & Meyers, Oil and Gas Law, Manual of Terms, p, 728 (2016).

. “A share of gross production from a property, measured by net profits from operation of the property.” 8 Williams & Meyers, Oil and Gas Law, Manual of Terms, p. 649 (2016).

. We note the trial court did not err in reducing Gloria’s Ranch’s damages by 25% to account for the EXCO settlement. Among soli-dary obligors, each is liable for his virile portion. If the obligation arises from a contract or quasi-contract, virile portions are equal in the absence of agreement or judgment to the contrary. La. C.C. art. 1804. Because the soli-dary relationship between the defendants was contractual and since the record reveals no agreement to the contrary, the defendants are each responsible for 25% of the damages and costs imposed by the trial court. A transaction and compromise between the obligee and one obligor, benefits the other solidary obligors in the amount of the portion of that obligor. La, C.C, art,. 1803. Due to the EXCO settlement prior to trial, the trial court properly reduced Gloria's Ranch’s damages by 25%.