# Supreme Court of Louisiana

The Opinions handed down on the **27th day of June, 2018**, are as follows:

**BY CLARK, J.:**

2017-C-1518      GLORIA'S RANCH, L.L.C. v. TAUREN EXPLORATION, INC., CUBIC ENERGY,
   C/W           INC., WELLS FARGO ENERGY CAPITAL, INC., AND EXCO USA ASSET, INC.
2017-C-1519      (Parish of Caddo)
2017-C-1522

A landowner brought suit against several mineral lessees for breach of the obligations of its mineral lease. The mortgagee of one of the lessees was also named as a defendant. The lower courts held all lessees and the mortgagee solidarily liable for damages resulting from the failure to furnish a recordable act evidencing the expiration of the lease, i.e., failure to release the lease. We granted these consolidated writ applications to determine (1) whether the mortgagee was properly held solidarily liable as an "owner" of the lease under La. Mineral Code art. 207 and a "lessee" under La. Mineral Code art. 140; (2) whether the imposition of solidary liability was correct with regard to the owner of the shallow rights; (3) whether La. Mineral Code art. 140's calculation of damages contemplates the inclusion of unpaid royalties (the amount due) in addition to double the amount of unpaid royalties (as a penalty) or whether the maximum damage award allowed is twice the amount of unpaid royalties; and (4) whether $125,000 in attorney fees for work done on appeal is excessive.For the reasons that follow, we find (1) the mortgagee was not an "owner" for purposes of La. Mineral Code art. 207 and is, therefore, not liable for failure to release the lease. For the same reasons, we find the mortgagee was not a "lessee" for purposes of La. Mineral Code art. 140 and, is, therefore, not liable for failure to pay royalties that were due. (2) We find Tauren is solidarily liable for the damages because the failure to release the lease is an indivisible obligation. (3) We hold La. Mineral Code art. 140 authorizes as damages a maximum of double the amount of unpaid royalties. (4) Last, we amend the award of attorney fees to reflect our holdings herein.

REVERSED IN PART; AMENDED IN PART; AND AFFIRMED AS AMENDED.

Retired Judge Hillary Crain assigned as Justice ad hoc, sitting for Cricthon, J., recused.

CRICHTON, J., recused.
WEIMER, J., concurs in part and dissents in part and assigns reasons.
GENOVESE, J., dissents in part and assigns reasons.

SUPREME COURT OF LOUISIANA

No. 2017-C-1518

CONSOLIDATED WITH

No. 2017-C-1519

CONSOLIDATED WITH

No. 2017-C-1522

GLORIA'S RANCH, L.L.C.

VERSUS

TAUREN EXPLORATION, INC., CUBIC ENERGY, INC., WELLS FARGO ENERGY CAPITAL, INC., AND EXCO USA ASSET, INC.

ON WRIT OF CERTIORARI TO THE COURT OF APPEAL, SECOND CIRCUIT, PARISH OF CADDO

**Clark, Justice\***

A landowner brought suit against several mineral lessees for breach of the obligations of the mineral lease. The mortgagee of one of the lessees was also named as a defendant. The lower courts held all lessees and the mortgagee solidarily liable for damages resulting from the failure to furnish a recordable act evidencing the expiration of the lease, *i.e.*, failure to release the lease. We granted these consolidated writ applications to determine (1) whether the mortgagee was properly held solidarily liable as an "owner" of the lease under La. Mineral Code art. 207 and a "lessee" under La. Mineral Code art. 140; (2) whether the imposition of solidary liability was correct with regard to the owner of a portion of the shallow rights; (3) whether La. Mineral Code art. 140's calculation of damages contemplates the inclusion of unpaid royalties (the amount due) in addition to double the amount of unpaid royalties (as a penalty) or whether the maximum damage award allowed is twice the amount of unpaid royalties; and (4) whether $125,000 in attorney fees for work done on appeal is excessive.

---

\*Judge Hillary Crain is assigned as Justice ad hoc, sitting for Crichton, J., recused.

For the reasons that follow, we find (1) the mortgagee was not an "owner" for purposes of La. Mineral Code art. 207 and is, therefore, not liable for failure to release the lease. For the same reasons, we find the mortgagee was not a "lessee" for purposes of La. Mineral Code art. 140 and, is, therefore, not liable for failure to pay royalties that were due. (2) We find Tauren is solidarily liable for the damages because the failure to release the lease is an indivisible obligation under the particular facts of this case. (3) We hold La. Mineral Code art. 140 authorizes as damages a maximum of double the amount of unpaid royalties. (4) Last, we amend the award of attorney fees to reflect our holdings herein.

## FACTS AND PROCEDURAL HISTORY

Gloria's Ranch, L.L.C. ("Gloria's Ranch") granted a mineral lease to Tauren Exploration, Inc. ("Tauren") on September 17, 2004. The lease covered 1,390.25 acres in Sections 9, 10, 15, 16, and 21, Township 15 North, Range 15 West, Caddo Parish, Louisiana ("the property"). Tauren was granted "the exclusive right to enter upon and use the land . . . for the exploration for and production of oil [and] gas . . . together with the use of the surface of the land for all purposes incident to [exploration and production] with the right of ingress and egress to and from said lands at all times for such purposes." The lease was granted for a primary term of three (3) years "and as long thereafter as oil, gas, sulphur, or other minerals is produced from [the property] or from land pooled therewith."

In February 2006, Tauren transferred an undivided 49% interest in the lease to Cubic Energy, Inc. ("Cubic"). On March 5, 2007, Tauren and Cubic executed separate credit agreements with Wells Fargo Energy Capital, Inc. ("Wells Fargo").[1] Wells Fargo provided Cubic with a revolving credit facility not to exceed

---

[1] The credit agreement between Wells Fargo and Tauren is not in the record. The instant opinion, however, concerns only the mortgage and credit agreement between Wells Fargo and Cubic.

$20,000,000 outstanding at any time and a $5,000,000 convertible term loan. As security, Cubic mortgaged its interest in approximately 750 mineral leases, including the instant lease with Gloria's Ranch, and assigned as collateral the profits earned therefrom.

In 2007, Tauren contracted with Fossil Operating Inc. ("Fossil") to commence oil and gas operations on the property. In early 2008, Fossil drilled and completed wells on Sections 9, 10, and 16 in an area known as the Cotton Valley geologic formation.[2] Fossil vertically drilled Section 16 to the Haynesville Shale formation, but completed the well only to the shallower depths of the Cotton Valley formation. Additionally, in 2008, another company, Chesapeake Operating, Inc. ("Chesapeake")[3] drilled a well, (the "Soaring Ridge 15-1 well") on a neighboring tract in the deeper Haynesville Shale formation. Chesapeake unitized the Gloria's Ranch property located in Section 15 with the Soaring Ridge 15-1 well. The unit, known as the "Soaring Ridge 15H," was horizontally drilled by Chesapeake into the Haynesville Shale formation. Chesapeake also drilled Section 21 ("Feist-21-1"). On September 1, 2009, Gloria's Ranch executed a top lease in favor of Chesapeake for the right to conduct operations on its property in Section 21. By definition and by the contract's terms, Chesapeake's lease only became effective if and when the existing 2004 lease to Tauren expired or was terminated.

Effective October 30, 2009, Tauren and EXCO USA Asset, Inc. ("EXCO") entered into a purchase and sale agreement. Pursuant to the agreement, Tauren conveyed its 51% interest in the Deep Rights to EXCO. Cubic conveyed to Tauren

---

[2] For purposes of this litigation, the geological strata between the surface and the base of the Cotton Valley Sands represent the "Shallow Rights." The geological strata below the base of the Cotton Valley Sands, including but not limited to the Haynesville Shale formation, represent the "Deep Rights."

[3] Chesapeake is not a party to the instant litigation.

an overriding royalty interest in Cubic's 49% interest in the Deep Rights. Simultaneously, Tauren made a cash payment to Wells Fargo and assigned to it a 10% net profits interest in the Shallow Rights and the overriding royalty interest in the Deep Rights received from Cubic. In exchange, Wells Fargo cancelled the Tauren mortgage.

On December 3, 2009, Gloria's Ranch sent a letter to Tauren, Cubic, EXCO and Wells Fargo ("the defendants"), seeking to establish whether the lease was still producing in paying quantities. It was the belief of Gloria's Ranch that the lease had expired for lack of production in paying quantities. Thus, it wanted confirmation via monthly revenue and expense reports that the wells were still profitable.

Tauren responded that it had miscalculated some of its expenses but assured Gloria's Ranch that the wells were still producing in paying quantities. Ultimately, on January 28, 2010, Gloria's Ranch sent written demand to the defendants, requesting a recordable act evidencing the expiration of the lease. No response was forthcoming by any of the defendants. Accordingly, Gloria's Ranch filed suit, alleging the defendants failed to furnish a recordable act evidencing the expiration of the lease as required by La. Mineral Code arts. 206 and 207. Gloria's Ranch claimed in its petition that the lease expired for not producing in paying quantities and that the defendants' failure to release the lease caused it damages in the amount of lost bonus payments, lost rentals, and lost royalties. Additionally, it sought unpaid royalties for Section 15, which was still maintained by production from the Soaring Ridge 15H.

Gloria's Ranch reached a settlement with EXCO on August 13, 2014, thereby releasing EXCO as a defendant in this matter.

A bench trial was held, and the trial court rendered judgment in favor of Gloria's Ranch and against Tauren, Cubic, and Wells Fargo *in solido*. It found the

4

lease had expired as to Sections 9, 10, 16, and 21 due to lack of production in paying quantities for at least the twelve months preceding the January 28, 2010 demand and that the defendants failed to furnish a recordable act evidencing same, as required by the law.[4] The court also found that the 16-1 well was not drilled in good faith. Rather, it was drilled solely to maintain the Deep Rights for purposes of speculation. The trial court awarded damages for lost-leasing opportunities at $18,000 per acre ($22,806,000).[5] It further awarded $726,087.78 for unpaid royalties for Section 15 pursuant to La. Mineral Code art. 140 ($242,029.26 in royalties due plus $484,058.52 in double royalties as a penalty). Attorney fees in the amount of $936,803 were also awarded.

With regard to Wells Fargo's solidary liability, the trial court found that Wells Fargo breached its duty to Gloria's Ranch either to release its mortgage on the lease or to authorize Cubic to release the lease. The trial court reasoned that (1) Wells Fargo's mortgage included an assignment of the lease; (2) Wells Fargo controlled Cubic's right to release and never authorized a release; (3) Wells Fargo controlled the revenue from the lease by virtue of an assignment of revenues, a net profits interest, and a overriding royalty interest; and (4) Wells Fargo knew the lease had expired because it regularly audited Tauren and Cubic's well cost and revenue information.

Tauren, Cubic, and Wells Fargo filed motions for new trial. On November 23, 2015, the trial court granted the motions, in part, reducing the damage awards by EXCO's virile portion (25%) to reflect EXCO's settlement. *See* La. C.C. art. 1804.

---

[4] The court of appeal found the lease did not produce in paying quantities for the 18-month period prior to demand by Gloria's Ranch in January of 2010.

[5] Sections 15 and 21 were excluded from this award. The trial court did not award any damages for lost-leasing opportunities for Section 15 since it was still producing or for Section 21 since Gloria's Ranch was able to lease it.

5

The defendants appealed. The court of appeal affirmed the judgment and awarded $125,000 in attorney fees for work done on appeal. *Gloria's Ranch, L.L.C. v. Tauren Exploration, Inc.*, 51,077 (La. App. 2 Cir. 6/2/17), 223 So.3d 1202. Tauren, Cubic, and Wells Fargo filed writ applications. We consolidated and granted their writs to determine the correctness of the lower courts' judgments. *Gloria's Ranch, L.L.C. v. Tauren Exploration, Inc.*, 17-1518, 17-1519, 17-1522 (La. 12/15/17), 231 So.3d 639; 231 So.3d 640; 231 So.3d 642. We will address each writ application separately.

## DISCUSSION

*Wells Fargo*

Wells Fargo challenges the lower courts' finding that it was solidarily liable with the remaining defendants for Gloria's Ranch's damages. Wells Fargo argued that it is not responsible for the obligations sued upon, as they are obligations of the mineral lessees, not of the mortgagee of a mineral lessee. Louisiana Mineral Code art. 206(A) (La. R.S. 31:206) provides:

> Except as provided in Paragraph B of this Article [not applicable herein], when a mineral right is extinguished by the accrual of liberative prescription, expiration of its term, or otherwise, the former owner shall, within thirty days after written demand by the person in whose favor the right has been extinguished or terminated, furnish him with a recordable act evidencing the extinction or expiration of the right.

Louisiana Mineral Code art. 207 (La. R.S. 31:207) provides:

> If the former owner of the extinguished or expired mineral right fails to furnish the required act within thirty days of receipt of the demand or if the former lessee of a mineral lease fails to record the required act within ninety days of its extinguishment prior to the expiration of its primary term, he is liable to the person in whose favor the right or the lease has been extinguished or expired for all damages resulting therefrom and for a reasonable attorney's fee incurred in bringing suit.

6

Wells Fargo contends it is not an owner of the lease; it is merely a creditor with a security interest in the lease.[6] As such, Wells Fargo asserts it was improperly held responsible for any breach of the lease obligations. Gloria's Ranch, however, argues Wells Fargo is an assignee of the lease, an overriding royalty owner, and a net profits owner. It also argues that the "bundle of rights" assumed by Wells Fargo amounted to ownership under civilian law, and, accordingly, Wells Fargo is liable with the other defendants under a "control theory." Furthermore, Gloria's Ranch avers that Wells Fargo's mortgage created a cloud on its title, and Wells Fargo was properly held liable for its failure to release its mortgage. Last, Gloria's Ranch argues Wells Fargo judicially admitted to having an interest in the lease. Because Gloria's Ranch relied on this statement to its detriment, it contends Wells Fargo should be bound by its admission with no further proof of ownership required.

The relevant clauses in the mortgage agreement between Cubic and Wells Fargo provide:

> **2.01 Hypothecation.** (a) In order to secure the full and punctual payment and performance of all present future Indebtedness, the Mortgagor does by these presents specially mortgage, affect, hypothecate, pledge, and assign unto and in favor of Mortgagee, to inure to the use and benefit of Mortgagee, the following described property, to-wit:
>
> > (1) The Mineral Properties, together with all rents, profits, products and proceeds, whether now or hereafter existing or arising, from the Mineral Properties[.][7]
>
> **2.02 The Security Interests.** In order to secure the full and punctual payment and performance of all present and future Indebtedness, Mortgagor hereby grants to Mortgagee a continuing security interest in and to all right, title and interest of Mortgagor in, to and under the

---

[6] Wells Fargo points to the express provisions in the mortgage and credit agreements that state there is no intent on the part of Wells Fargo to assume the obligations of the mineral lease, to assume any obligation of Cubic, or to provide any benefit to a third party.

[7] "Mineral Properties" is defined in the mortgage as "all of Mortgagor's right, title and interests in the oil, gas, and mineral leases, mineral servitudes, subleases, farmouts, royalties, overriding royalties, net profits interests, production payments, operating rights and similar mineral interests and subleases and assignments of such mineral interest[s]."

following property, whether now owned or existing or hereafter acquired or arising and regardless of where located:

> (1) The Mineral Properties

**2.03 <u>Assignment.</u>** To further secure the full and punctual payment and performance of all present and future Indebtedness, up to the maximum amount outstanding at any time...Mortgagor does hereby absolutely, irrevocably and unconditionally pledge, pawn, assign, transfer and assign to Mortgagee all monies which accrue after 7:00 a.m. Central Time...to Mortgagor's interest in the Mineral Properties and all present and future rents therefrom...and all proceeds of the Hydrocarbons...and of the products obtained, produced or processed from or attributable to the Mineral Properties now or hereafter (which monies, rents and proceeds are referred herein as the "<u>Proceeds of Runs</u>"). Mortgagor hereby authorizes and directs all obligors of any Proceeds of Runs to pay and deliver to Mortgagee, upon request therefor by Mortgagee, all of the Proceeds of Runs...accruing to Mortgagor's interest[.] (Emphasis in original).

* * *

**5.02 <u>Remedies.</u>**

* * *

(b) Upon the occurrence of any Event of Default, Mortgagee may take such action, without notice or demand, as it deems advisable to protect and enforce its rights against Mortgagor and in and to the Collateral...

* * *

**5.05 <u>Sale.</u>** Upon the occurrence of an Event of Default, Mortgagee may exercise all rights of a secured party under the UCC and other applicable law...and, in addition, Mortgagee may, without being required to give any notice, except as herein provided or as may be required by mandatory provisions of law, sell the Collateral or any part thereof at public or private sale, for cash, upon credit or future delivery, and at such price or prices as Mortgagee may deem satisfactory. Mortgagee may be the purchaser of any or all of the Collateral so sold at any public sale...Upon any such sale, Mortgagee shall have the right to deliver, assign and transfer to the purchaser thereof the Collateral so sold[.]

The court of appeal rejected the argument that the lease was transferred to Wells Fargo by assignment. Because the mortgage did not transfer Cubic's working interest in the land, the court of appeal found an assignment did not occur. It held:

> The language of the mortgage shows the purpose of the instrument was for Cubic to secure its loans with Wells Fargo by granting Wells Fargo a continuing security interest in multiple mineral leases, which included

8

Gloria's Ranch's lease. In the event Cubic defaulted on its loans, the mortgage gave Wells Fargo the right to seize and sell the lease to satisfy the debt. As such, we find the use of the word "assign" in the Hypothecation clause does not deprive the mortgage of its character, which is to "secure the full and punctual payment and performance of the Indebtedness.

*Gloria's Ranch L.L.C.*, 51,077 at 30-31, 223 So.3d at 1222.

We agree. Wells Fargo cannot be considered an "owner" of the lease by virtue of an assignment. "The assignor transfers his entire interest in the lease insofar as it affects the property on which the lease is assigned." *Roberson v. Pioneer Gas Co.*, 173 La. 313, 319, 137 So. 46, 48 (1931). Because Cubic still maintained its working interest in the property, the assignment argument fails.

However, the court of appeal did not end its analysis there. Citing La. Civ. Code art. 477, the court of appeal found merit in Gloria's Ranch's argument that Wells Fargo became an owner of the lease because it "controlled the bundle of rights that make up ownership, *i.e.*, the rights to use, enjoy, and dispose of the lease." *Gloria's Ranch L.L.C.*, 51,077 at 31, 223 So.3d at 1222. Specifically, the court of appeal found the control Wells Fargo had over Cubic's right to conduct oil and gas operations on the property by virtue of the mortgage and the credit agreement rose to the level of ownership, providing several examples that it classified as civilian rights of "usus," "fructus," and "abusus." The court of appeal noted the following rights and provisions that it perceived as "rights of control": the credit agreement's language that directed where the loan proceeds were to be spent; Wells Fargo's right to approve the location and depth of the wells; Wells Fargo's ability to specify which workovers and completions were to be performed; Wells Fargo's requirement that Cubic provide it with financial statements, Wells Fargo's right to access Gloria's Ranch's property; Wells Fargo's overriding royalty interest and net profits interest; and Wells Fargo's requirement that Cubic obtain its written consent to release the

9

lease. For the following reasons, we find the court of appeal committed error in holding that such rights, which are incidental to mortgage and credit agreement, rose to the level of ownership of a mineral lease.

First, on a legal basis, we find no authority for superseding the ownership principles set forth in the La. Mineral Code with those of the La. Civil Code. "The provisions of [the La. Mineral] Code are supplementary to those of the Louisiana Civil Code and are applicable specifically to the subject matter of mineral law." La. Mineral Code art. 2. As such, the La. Mineral Code governs the creation, ownership, and transfer of mineral rights. Louisiana Mineral Code art. 16 provides that "[t]he basic mineral rights that may be created by a landowner are the mineral servitude, the mineral royalty, and the mineral lease." Mineral leases are created by contract. *See* La. Mineral Code art. 114. Ownership of the mineral lease can be transferred by assignment or sublease. *See* La. Mineral Code art. 127. In the instance of assignment or sublease, "[t]o the extent of the interest acquired, an assignee or sublessee acquires the rights and powers of the lessee and becomes responsible directly to the original lessor for performance of the lessee's obligations. *See* La. Mineral Code art. 128. We do not find where the La. Mineral Code addresses or sanctions ownership of a lessee's interest via a theory of control of rights.

Further, rights of ownership are distinguished from security rights in the La. Mineral Code. Louisiana Mineral Code art. 203 provides:

> A mineral right is susceptible of mortgage to the same extent and with the same effect, and subject to the same provisions of rank, inscription, reinscription, extinguishment, transfer, and enforcement as is prescribed by law for mortgages of immovables under Article 3286 of the Civil Code.

Louisiana Mineral Code art. 204 states:

> A mortgage of mineral rights may also provide the pledge of minerals subsequently produced to the extent of the mortgagor's interest therein or of the proceeds accruing from the sale or other disposition thereof...

10

Based on the foregoing, we find no authority for the court of appeal's holding that a mortgage and a credit agreement, which are both legally provided for in the La. Mineral Code, can be methods by which ownership of a mineral lease are conveyed simply because they assert some control over the collateral described therein. We find the "bundle of rights" controlled by Wells Fargo are not traits of ownership, but of security rights. The mortgage and credit agreement contain provisions typical of security contracts, all designed to protect the collateral.

Importantly, none of the provisions of the mortgage or credit agreement convey to Wells Fargo the right to explore for and produce minerals on the property—the primary right granted in a mineral lease and the stamp of ownership thereof. *See* La. Mineral Code arts. 6 and 114. Rather, the provisions incorrectly held by the court of appeal as rights of "usus," "abusus," and "fructus" are security interests and derivative interests related to the sole goal of safeguarding the collateral (the lease). We find it unnecessary to address each provision in the contract because we find that none of the provisions convey rights of ownership, taken individually or as a whole. Rather, we will discuss broadly each category of rights as presented by the court of appeal ("fructus," "usus," and "abusus").

First, we note it is customary in the oil and gas industry for a lender to (1) include restrictions on how the debtor/borrower will use the leased property, (2) require full financial information with regard to the "status of the collateral encumbered by the mortgage," (3) require that the borrower "maintain the encumbered mineral leases in force and effect," and (4) allow inspection of the premises, among other protective provisions. *See, e.g.*, Patrick S. Ottinger, *Louisiana Mineral Leases: A Treatise*, §12-10 (Claitor's Law Book & Publishing Div., Inc. 2016).

As to the contracts at issue, Cubic contractually agreed that, only upon default, it would pay to Wells Fargo the proceeds from production. This pledge of proceeds, which is authorized by La. Mineral Code art. 204, is merely a security device – not an assignment of the *fructus* (civil fruits) of the mortgaged property for purposes of creating ownership or holding a mortgagee liable for the obligations of its debtor. The existence of a security interest without more, does not subject a mortgagee to liability for the mortgagor's breach of the lease contract.[8] Also, the pledge at issue is conditional, and we find no record evidence that Cubic was ever in default or that Wells Fargo ever exercised such rights so as to trigger the assignment of the proceeds.

Regarding the purported "usus" (physical use) of the property, we find the oversight rights, the right to enter the property, and the right for Wells Fargo to direct "use of the proceeds," among others, are typical rights of a secured creditor and exist for the clear purpose of insuring the maintenance of the collateral. They do not convey any rights of ownership. Rather, these rights are solely to keep the lender abreast of the debtor's ability to pay back the loan and remain informed of the collateral's condition.

The last category, the alleged right of *abusus* (alienation), merits additional discussion inasmuch as Gloria's Ranch and the lower courts emphasized the provision which requires Wells Fargo's consent as a prerequisite to Cubic releasing its lease interest. First, we note that Cubic never requested Wells Fargo's consent to release the lease (or the mortgage thereof). Second, even if Wells Fargo had released its mortgage, the lease still would not have been released as it relates to Gloria's Ranch. This is because there was never any privity of contract between Wells Fargo and Gloria's Ranch. The privity of contract existed between Gloria's Ranch and its

---

[8] *See* La. R.S. 10:9-402.

12

lessees pursuant to the mineral lease. A separate contractual relationship existed between Wells Fargo and Cubic in the form of a mortgage and a credit agreement. A breach of one contract does not directly impact the other contract so as to create a cause of action where one does not exist. Namely, any failure of Wells Fargo to consent to release the lease does not amount to a cause of action by Gloria's Ranch against Wells Fargo. Rather, if Cubic had requested Wells Fargo's consent (of which there is no record evidence) and Wells Fargo had withheld it, the recourse would not be for Gloria's Ranch to sue Wells Fargo. The only available recourse for Gloria's Ranch would be to sue the owners of the lease (the lessees), with whom it has privity of contract. Cubic, in the event consent had been requested and withheld, could have available to it a contractual claim against Wells Fargo in the form of indemnity, third party demand, reimbursement, or some other incidental demand. *See* La. Code Civ. P. art. 1031; *see also Nassif v. Sunrise Homes, Inc.*, 98-3193, pp. 2-3 (La. 6/29/99), 739 So.2d 183, 185. However, this obligation is distinct and separate from that owed by Cubic to Gloria's Ranch. The clause in Cubic's mortgage that requires Wells Fargo's consent to release the lease is merely a protection over its collateral, not an element of ownership. As such, Wells Fargo cannot be held solidarily liable for the obligation of an owner of the lease merely by virtue of its security interest.

Gloria's Ranch also avers that if Wells Fargo had not released the mortgage, there would be a cloud on the title and no buyer would want to acquire the lease. This argument fails, though, because once the subject of the mortgage (the lease) no longer exists, the mortgage no longer exists by operation of extinction. Louisiana Civ. Code art. 3319(1) provides: "A mortgage is extinguished by the extinction or destruction of the thing mortgaged." Thus, in the event the lease was released by Cubic, the mortgage would cease to exist. There would be no mortgage, then, to "cloud" Gloria Ranch's title. (*See also* La. Civ. Code art. 3282: "Mortgage is

13

accessory to the obligation that it secures. Consequently, except as provided by law, the mortgagee may enforce the mortgage only to the extent that he may enforce any obligation it secures.")

Additionally, we find no merit to the argument that because Wells Fargo acquired an overriding royalty interest[9] and net profits interest[10] from Tauren's interest in the lease, it somehow became an owner of the lease. These financial interests are merely passive, derivative rights given in exchange for the cancellation of Tauren's mortgage. "The owner of a mineral royalty has no executive rights; nor does he have the right to conduct operations to explore for or produce minerals." La. Mineral Code art. 81. These rights, which do not convey any authority to go onto the property, drill, explore, or otherwise perpetuate an oil and gas lease, do not amount to ownership and, thus, do not give rise to the obligations associated with ownership, such as the payment of royalties, the maintenance of production in paying quantities, or the release of the lease upon demand.

Last, we do not find the case is resolved by resort to a judicial admission, as argued by Gloria's Ranch. In initially opposing lease cancellation, Wells Fargo stated in a pleading that it had a "leasehold interest." Based on this statement, Gloria's Ranch argues Wells Fargo judicially confessed to ownership of the mineral lease and should be held accountable for such admission. We reject this argument, finding that Wells Fargo, at best, admitted to owning a *security* interest in the lease. Whether that interest amounted to an ownership interest is a mixed question of law and fact, requiring a review of the facts, an interpretation of the mortgage, and an

---

[9] An overriding royalty is "[a]n interest in oil and gas produced at the surface, free of the expense of production, and in addition to the usual landowner's royalty reserved to the lessor in an oil and gas lease." 8 Williams & Meyers, *Oil and Gas Law*, Manual of Terms, p. 728 (2016).

[10] A net profits interest is "[a] share of gross production from a property, measured by net profits from operation of the property." 8 Williams & Meyers, *Oil and Gas Law*, Manual of Terms, p. 649 (2016).

analysis of the law. Thus, whether, and to what extent, Gloria's Ranch relied on this so-called admission to its detriment is irrelevant. The transfer of a mineral lease to create ownership cannot be created simply by judicial admission. Further, the evidence contradicts the admission. As such, the admission cannot serve to exclusively establish the "leasehold interest."

In sum, we find that Wells Fargo, in its capacity as a creditor with only a security interest in the mineral lease, is not solidarily liable with its debtor, the mineral lessee, for obligations breached thereby. Wells Fargo acquired a mortgage affecting the mineral lease in addition to a net profits interest and an overriding royalty interest. These interests are solely accessory and derivative rights and do not amount to rights of ownership. Because Wells Fargo is not a "former owner" under La. Mineral Code art. 207, it cannot be held liable for any damages resulting from the failure to release the lease.

With regard to the damages awarded for unpaid royalties for Section 15, we employ the same analysis. Under La. Mineral Code art. 140, quoted *infra*, the law holds a "lessee" liable for failure to pay royalties that are due. For the same reasons that we hold a creditor is not liable as a "former owner" under La. Mineral Code art. 207, we find Wells Fargo not liable for unpaid royalties as a "lessee" under La. Mineral Code art. 140. Accordingly, we reverse the judgment as to Wells Fargo.

*Tauren*

Tauren asks this court to find that the mineral lease was horizontally divided when it conveyed its interest in the Deep Rights to EXCO. Such a finding, Tauren argues, would mean that two leases were created, and Tauren could not be held responsible for any obligations related to a lease it did not own. Thus, it argues the damages caused by the failure to release the lease(s) back to Gloria's Ranch (upon termination and demand) should be paid jointly, with each lessee being responsible

15

only for its own lease obligations. Tauren contends most of the damages resulted from the lost opportunity to lease the Deep Rights, over which it had no authority. Accordingly, Tauren claims it cannot be held solidarily liable for the full damages.

Gloria's Ranch, on the other hand, argues Tauren and its co-defendants are each liable for the entirety of the damages for failing to release the lease. The court of appeal found Tauren solidarily liable because "the obligation of the owners of the lease to produce a recordable act evidencing the release of the lease was indivisible." *Gloria's Ranch L.L.C.*, 51,077 at 25, 223 So.3d at 1219. For the reasons that follow, we agree that the obligation to release is indivisible.

An obligation is a legal relationship whereby a person, called the obligor, is bound to render a performance in favor of another, called the obligee. La. Civ. Code art. 1756. When different obligors owe together just one performance to one obligee, but neither is bound for the whole, the obligation is joint for the obligors. La. Civ. Code art. 1788. An obligation is indivisible when the object of the performance, because of its nature or because of the intent of the parties, is not susceptible of division. La. Civ. Code art. 1815. When a joint obligation is indivisible, joint obligors are subject to the rules governing solidary obligors. La. Civ. Code art. 1789. An indivisible obligation with more than one obligor or obligee is subject to the rules governing solidary obligations. La. Civ. Code art. 1818. Solidarity of obligation shall not be presumed. A solidary obligation arises from a clear expression of the parties' intent or from the law. La. Civ. Code art. 1796. When distinct obligors owe the same indivisible performance to one obligee, they are solidarily bound to that obligee, regardless of their intentions. La. Civ. Code art. 1818, Comment (b).

Tauren is indisputably a "former owner" of the mineral lease because it held a 51% working interest in the Shallow Rights, as well as the surface rights and the exclusive right to drill on the property. Thus, Tauren's failure to release the lease

makes it liable to Gloria's Ranch "for all damages resulting therefrom and for a reasonable attorney's fee incurred in bringing suit." La. Mineral Code art. 207. Tauren argues its own failure to release the lease should only be measured in damages commensurate to the value of the Shallow Rights. However, under the facts of this case, we find the obligation to release the lease is an indivisible obligation under the La. Civil Code.[11] As stated earlier, La. Civ. Code art. 1815

---

[11] We expressly reject Tauren's argument that the obligation to release was a divisible obligation and that it only was responsible for the failure to release the Shallow Rights. We take particular note that Tauren was the original lessee, who still owned an interest in the lease, which included the "exclusive rights to enter upon and use the land" for the "exploration for and production of oil [and] gas." Tauren retained the surface rights and the corresponding right to drill thereon. Further, the record shows that Tauren failed to disclose to EXCO, prior to its transfer of the Deep Rights, the lease's production shortcomings. Additionally, Tauren participated in the accounting manipulations in an effort to make it appear that the lease was still producing in paying quantities. These acts all led to the underlying failure to release the lease back to Gloria's Ranch, which necessitated judicial demand and the instant lawsuit. Accordingly, Tauren's acts in large part induced the other defendants not to release the lease. It cannot now attempt to escape liability by arguing the lease was divided such that it was only required to release the Shallow Rights while the others were obligated to release the Deep Rights.

Moreover, the record evidence reveals that the lease stopped producing in paying quantities on or around July of 2008, well before the transfer of the deep rights to EXCO. Mike Cougevan, an expert in oil and gas accounting and auditing, testified that the wells at issue were not producing in paying quantities in the 18-month period prior to the January 2010 demand by Gloria's Ranch. Additionally, Robert McGowen, a petroleum engineer, stated in his appraisal:

> Production and revenue information for the 9-1, 10-1, and 16-1 indicates that none of these wells produced in paying quantities. The cost and revenue information for the wells indicates shortly after each well was drilled, it began operating at a loss that has only increased over time. By July 2008, the GR 9-1, 10-1, and 16-1 were operating at a cumulative loss and never regained profitability.

He further testified that the lease was not producing in paying quantities for "the majority of the life of the wells." He opined that the lease was not being released due to speculative purposes and in an attempt to hold the lease for unknown future activity. We note that such speculation is against the law and public policy. *See, e.g., Carter v. Arkansas-Louisiana Gas Co.*, 36 So.2d 28 (La. 1948).

Tauren's expert, Michael McKenzie, a petroleum engineer, did not disagree with the findings of Mr. McGowen or Mr. Blunk. Rather, he found that Tauren and Cubic's "knowledge of the potential of the Haynesville Shale, and its negotiations and eventual contract with EXCO" were "consistent with the conduct of a reasonably prudent operator." Notably, the finding of the lower courts that the lease was no longer producing in paying quantities was not appealed to this court.

Thus, the lease expired in July 2008, by its own terms, which was before the 2009 transfer to EXCO. (Louisiana Mineral Code art. 133 provides: "A mineral lease terminates at the expiration of the agreed term or upon the occurrence of an express resolutory condition.") We acknowledge that the obligation to furnish a recordable act evidencing the expiration of the lease (*i.e.*, the obligation to release the lease), for purposes of damages, is tethered to written demand by the landowner. *See* La. Mineral Code arts. 206 and 207, *supra.* However, because the lease technically expired before the purported assignment of rights, we will not entertain a theory of

17

classifies an obligation as indivisible when the object of the performance is not susceptible of division. An obligation is indivisible when the performance of the obligation cannot be divided or when partial performance would be of little or no use to the obligee. *Sweet Lake Land & Oil Co. LLC v. Exxon Mobil Corp.*, 9-110, 2011 WL 5825791 (W.D. La. 11/16/11), *citing* 5 Saul Litvinoff, Louisiana Civil Law Treatise, Law of Obligations § 9.2 (2011). When an obligation is indivisible, all obligors must be held solidarily liable for the full performance. La. Civ. Code art. 1818.

The court in *Sweet Lake*, *supra*, was tasked with determining whether solidary liability was appropriate in the context of a property restoration case. One of the lessees argued it should only be held liable for the restoration of the property to the extent of its fractional interest in the lease. The court disagreed, holding instead that the obligation to restore the property was an indivisible obligation because "[p]roperty is either restored or it is not." *Sweet Lake*, 2011 WL 5825791 at 5. We are influenced by the logic of this case and, likewise, find that the mineral lease at issue was either released or it was not. It is clear that the release by only one lessee, or less than all lessees, would have been of little or no use to Gloria's Ranch insofar as Gloria's Ranch would have been prevented from granting a new lease to another interested buyer.[12] Accordingly, we do not find it necessary to address the

---

divisibility as a manner by which Tauren can escape liability. In finding the obligation to release to be an indivisible obligation in the context of these facts, we refuse to condone the acts of a lease owner who knows its lease is not producing, misrepresents such to the landowner, holds the lease for speculative purposes, finds a buyer at the eleventh hour before legal demand is made, and assigns the Deep Rights in an effort to divide the lease and, thereby, dispose of its liability.

[12] Tauren argues Gloria's Ranch was not prevented from entering into a new lease; it claims, to the contrary, that Gloria's Ranch entered into two new leases with Chesapeake and EXCO, respectively. However, we find that both of these leases were top leases and conditioned upon the defendants' release of the lease. For instance, Gloria's Ranch entered into a lease with Chesapeake for rights associated with Section 21. The contract, however, expressly states: "This Lease is subordinate to that certain Oil, Gas, and Mineral Lease between Lessor and Tauren Exploration, Inc. dated September 17, 2004 . . . Lessee shall have no rights under this Lease so long as the Prior Lease is in effect with respect to the Leased Premises." Further, the contract between Gloria's

18

divisibility of the lease because we find the underlying obligation to release the lease in this case is indivisible.[13] As such, Tauren, as an owner of the lease, was properly held liable *in solido* for the damages it caused.

Additionally, we find the unpaid royalties for Section 15 were directly attributed to Tauren and Cubic's failure to pay them; thus, Tauren cannot escape liability under any theory of divisibility. Lepow, a member and manager for Gloria's Ranch, contacted Chesapeake to inquire about the payment of royalties that were due. Lepow stated that SONRIS showed Chesapeake's Soaring Ridge 15H (which had been unitized to include Gloria's Ranch's property on Section 15) had been producing since the summer of 2008. Chesapeake informed Gloria's Ranch that Tauren and Cubic were receiving payments from the well's production. However, Lepow testified that Gloria's Ranch never received any of the royalty payments in connection with Section 15. Further, the record contains a clear admission that management knew of the obligation to pay royalties to Gloria's Ranch in connection with the Section 15 well and did not pay them. Accordingly, we find no error in the assessment of damages against Tauren for the unpaid royalties related to Section 15. We affirm the portion of the judgment as to Tauren's liability.

Next, Tauren argues the lower courts erred in determining the amount of damages due under La. Mineral Code art. 140. Louisiana Mineral Code art. 140 provides:

> If the lessee fails to pay royalties due or fails to inform the lessor of a reasonable cause for failure to pay in response to the required notice, *the court may award as damages double the amount of royalties due*, interest on that sum from the date due, and a reasonable attorney's

---

Ranch and EXCO (and final payment in consideration thereof) was conditioned upon the release of the Tauren lease or upon a final judgment cancelling that lease.

[13] Because we find the obligation to release the lease to be a singular, indivisible obligation under the circumstances of this case, we expressly reserve any judgment on whether a lease can be divided by the assignment of depths and pretermit analysis of the language of the lease relevant thereto. Our holding should be narrowly construed to the facts of this case.

fee regardless of the cause for the original failure to pay royalties. The court may also dissolve the lease in its discretion. (Emphasis added).

As argued by Gloria's Ranch, and as applied by the lower courts in the instant case, the legislature intended to give the court discretion to effectively award treble damages (the amount of royalties due plus a penalty of two times the amount of royalties due). Contrarily, Tauren argues the article allows a court to impose a maximum award of double the amount of royalties due.

The interpretation of a statute is a question of law and is reviewed by this court under a *de novo* standard of review. *Red Stick Studio Dev., L.L.C. v. State ex rel. Dep't of Econ. Dev.*, 10-0193 (La. 1/19/11), 56 So.3d 181, 184. As we explained in *M.J. Farms, Ltd. v. Exxon Mobil Corp.*, 07-2371, p. 13 (La. 7/1/08), 998 So.2d 16, 27 (internal citations omitted):

> The function of statutory interpretation and the construction given to legislative acts rests with the judicial branch of the government. The rules of statutory construction are designed to ascertain and enforce the intent of the Legislature. Legislation is the solemn expression of legislative will and, thus, the interpretation of legislation is primarily the search for the legislative intent. We have often noted the paramount consideration in statutory interpretation is ascertainment of the legislative intent and the reason or reasons which prompted the Legislature to enact the law.

> The starting point in the interpretation of any statute is the language of the statute itself. When a law is clear and unambiguous and its application does not lead to absurd consequences, the law shall be applied as written and no further interpretation may be made in search of the intent of the legislature.

Moreover, the words of a law must be given their generally prevailing meaning. La. Civ. Code art. 11. Louisiana Mineral Code art. 140 provides in pertinent part that "[i]f the lessee fails to pay royalties due . . ., the court may award as damages double the amount of royalties due." We find this language is a clear authorization by the legislature for courts to award a maximum of two times the amount of unpaid royalties, not three times the amount.

20

Gloria's Ranch argues we are to assume that the article's language implicitly excludes the original amount of royalties due since the original amount would be paid "as a sum of money that would be owed to [Gloria's Ranch] in any event, as [Gloria's Ranch] is the rightful owner of those royalty interests," (citing the court of appeal's holding in *Cimarex Energy Co.* v. *Mauboules*, 08-452, p.9 (La. App. 3 Cir. 3/11/09), 6 So.3d 399, 407).[14] Under this argument, La. Mineral Code art. 140 authorizes a "penalty" or "additional damages" of double that amount. Thus, Gloria's Ranch contends an award totaling three times the amount of unpaid royalties is authorized.

However, if we are to give every word its generally prevailing meaning, we are to read the word "damages" as it is generally meant. "An obligor is liable for the damages caused by his failure to perform a conventional obligation." La. Civ. Code art. 1994. "Damages are measured by the loss sustained by the obligee and the profit of which he has been deprived." La. Civ. Code art. 1995. "The measure of damages for a breach of contract is the sum that will place plaintiff in the same position as if the obligation had been fulfilled." *Dixie Roofing Co. of Pineville, Inc. v. Allen Parish Sch. Bd.*, 95-1526 (La. App. 3 Cir. 5/8/96), 690 So.2d 49, 56, *writs denied,* 96-2084 (La. 11/8/96), 683 So.2d 276, and 96-2100 (La. 11/8/96), 683 So.2d 277. Damages,

---

[14] This court granted writs in *Cimarex* and reversed on other grounds. *Cimarex Energy Co. v. Mauboules*, 09-1170 (La. 4/9/10), 40 So.3d 931, 952. However, Justice Knoll reached the issue of double versus treble damages in her dissent:

> The far more natural reading of article 212.23(C)[sic] is to permit the plaintiff a total award of double the amount of unpaid royalties. As a simplified example, if the unpaid royalties total $100, the court has discretion to "double" the award by adding an additional $100 in statutory damages, for a total of $200. If the Legislature had intended article [212.23C] to permit a treble damages award, it would have said so. Several Louisiana statutes unambiguously permit an award of treble damages. This is not one of them. Moreover, as Mineral Code article [212.23C] is in the nature of a penal statute, it must be strictly construed in favor of the defendant. *Louisiana Bag Co. v. Audubon Indemnity Co.*, 08-0453 (La. 12/2/08), 999 So. 2d 1104, 1120.

then, are the judicial remedy whereby money replaces the obligation that was not performed.

Based on this generally accepted definition of damages as compensation for the loss sustained, we interpret La. Mineral Code art. 140 as authority to award up to double the amount of royalties due. Clearly, an award of the amount of royalties due is the compensation for the failure to perform that obligation. The use of the permissive word "may" gives the court the authority to double that amount if the court, in its discretion, finds the defendant's conduct so warrants. A contrary reading that assumes the unpaid royalties are something separate from "damages" ignores the plain meaning of the word "damages." We do not believe the law, as written, leads to any absurd results, and, thus, we conduct no further investigation as to the legislative intent. Accordingly, we amend the judgment to reflect that the damages due under La. Mineral Code art. 140 are equivalent to two times the amount of royalties due ($242,029.26 x 2= 484,058.52).

*Cubic*

Cubic filed a writ application, solely asking this court to reduce or eliminate the award of attorney fees for work done on appeal. The trial court awarded Gloria's Ranch $925,603 for pretrial attorney fees and expert costs and $11,200 for attorney fees incurred during the trial. For work done on appeal, the court of appeal awarded an additional $125,000 in attorney fees. In so doing, the court of appeal stated:

> After reviewing the record, we acknowledge the diligence, tenacity, and expertise required by Gloria's Ranch's attorneys in successfully defending the trial court's judgment. Notably, Wells Fargo did not hire separate counsel until after final judgment had been rendered, and as a result, Gloria's Ranch's attorneys were forced to vehemently defend Wells Fargo's solidary liability on motion for new trial and appeal. Considering the length and complexity of this 19-volume case, Gloria's Ranch is entitled to $125,000 in additional attorney fees for work done on appeal.

Cubic argues this award is excessive.

22

Additional attorney fees for work done on appeal can be available when a party is entitled to an attorney fee by statute or contract, actually receives one at trial, and defends the defendant's unsuccessful appeal. *Frith v. Riverwood Inc.*, 04-1086 (La. 1/19/05), 892 So.2d 7. The court of appeal based its award of additional attorney fees on the work necessitated by the enrollment of Wells Fargo's new counsel. Because we herein reverse the judgment as to Wells Fargo, we find Gloria's Ranch is not due additional attorney fees for defending an appeal that was ultimately successful. To the extent the additional attorney fees represented work done with regard to Tauren and Cubic's appeals, we reduce the judgment from $125,000 to $50,000.

## CONCLUSION

Based on the foregoing, we find the lower courts improperly held Wells Fargo liable as an "owner" under La. Mineral Code art. 207 and a "lessee" under La. Mineral Code art. 140. Thus, we reverse the judgment as to Wells Fargo. Second, we affirm the judgment of solidary liability against Tauren, finding the obligation to furnish a recordable act evidencing the release of the lease is an indivisible obligation under the facts of this case. Third, we amend the amount of damages awarded under La. Mineral Code art. 140 to reflect a maximum award of double the amount of unpaid royalties. Last, we amend the amount of attorney fees awarded for work done on appeal.

**REVERSED IN PART; AMENDED IN PART; AND AFFIRMED AS AMENDED.**

**SUPREME COURT OF LOUISIANA**

**No. 2017-C-1518**

**CONSOLIDATED WITH**

**No. 2017-C-1519**

**CONSOLIDATED WITH**

**No. 2017-C-1522**

**GLORIA'S RANCH, L.L.C.**
**VERSUS**
**TAUREN EXPLORATION, INC., CUBIC ENERGY, INC., WELLS FARGO**
**ENERGY CAPITAL, INC., AND EXCO USA ASSET, INC.**

*ON WRIT OF CERTIORARI TO THE COURT OF APPEAL,*
*SECOND CIRCUIT, PARISH OF CADDO*

**WEIMER, Justice**, concurring in part and dissenting in part.

I concur in the result related to the liability of Tauren Exploration, Inc. I agree that the finding of liability is limited to the facts of this case. As such, I find that the discussion regarding the indivisibility of the release of the lease is unnecessary.

I dissent regarding the amount awarded in attorney fees, finding the amount awarded excessive.

SUPREME COURT OF LOUISIANA

No. 2017-C-1518

CONSOLIDATED WITH

No. 2017-C-1519

CONSOLIDATED WITH

No. 2017-C-1522

GLORIA'S RANCH, L.L.C.

VERSUS

TAUREN EXPLORATION, INC., CUBIC ENERGY, INC., WELLS FARGO ENERGY CAPITAL, INC., AND EXCO USA ASSET, INC.

ON WRIT OF CERTIORARI TO THE COURT OF APPEAL, SECOND CIRCUIT, PARISH OF CADDO

**GENOVESE, Justice, dissents in part.**

I dissent in part with respect to this Court's interpretation of La. Mineral Code art. 140's provision of damages. In all other aspects, I fully agree with the majority's opinion.

With respect to the issue of damages provided in this case, La. Mineral Code art. 140 provides that "[i]f the lessee fails to pay royalties due…, the court may award as damages double the amount of royalties due…." While this article does not expressly provide for "treble damages," it does provide that a court, in its discretion, may award as damages **double the amount of unpaid royalties,** in addition to the actual royalties due. This article's use of the word "may" indicates a discretionary award. Under the majority's interpretation, the award of the actual royalties due is necessarily part of the court's discretionary award. This interpretation leads to absurd results.

A clear reading of La. Mineral Code art. 140 recognizes and acknowledges two awards under the umbrella of damages for nonpayment of royalties: 1) an award

for the amount of royalties due; and 2) a discretionary award of a penalty of double the amount of royalties due. The majority interprets La. Mineral Code art. 140 as authority to award only "up to" double the amount of royalties due. Following this logic, the penalty award of damages includes the royalties award. Thus, Gloria's Ranch would only get the penalty portion of the damage award and not the royalties and the penalty. The statute does not say "up to;" it says "the court may award as damages double the amount of royalties due…." Nowhere in the statute does it state that royalties are subsumed or included in any damage award.

Consequently, in my view, under La. Mineral Code art. 140, Gloria's Ranch is entitled to the royalties due and owing as part of its damage award, and it is also entitled to a penalty double the amount of said royalties for nonpayment of the same. The trial court's award did not constitute double damages. Rather, Gloria's Ranch was rightfully awarded its royalties due, plus the trial court's discretionary penalty award of double damages.

The interpretation that La. Mineral Code art. 140 allows for double damages in addition to the payment of the royalties due is also supported by the language of the preceding article, which applies in cases where royalties due are paid late, after the lessee's receipt of the required notice from the lessor. This article, entitled "Effect of payment in response to notice," states:

> If the lessee pays the royalties due in response to the required notice, the remedy of dissolution shall be unavailable unless it be found that the original failure to pay was fraudulent. **The court may award as damages double the amount of royalties due**, interest on that sum from the date due, and a reasonable attorney's fee, provided the original failure to pay royalties was either fraudulent or willful and without reasonable grounds. In all other cases, such as mere oversight or neglect, damages shall be limited to interest on the royalties computed from the date due, and a reasonable attorney's fee….

La. R.S. 31:139 (emphasis added).

2

This article, which uses the exact same language presently at issue in La. Mineral Code art. 140, is discussing a discretionary award of *additional* damages **where the royalties in question have already be paid in response to a notice provided by the lessee**. It would be nonsensical for damages to be greater in a case where the royalties **were paid late** than in a case falling under La. Mineral Code art. 140, where they have **not been paid at all**. As the Court of Appeal explained:

> Under [La. Mineral Code] Article 139, when a lessee pays the royalties due after receiving notice of nonpayment from the lessor, the trial court "may award as damages double the amount of royalties due," if the original failure to pay was either fraudulent or willful and without reasonable grounds. Thus, the phrase "damages double the amount of royalties due" in Article 139 strictly pertains to punitive damages and excludes the actual royalties due. In keeping with the spirit of Article 139, we find the legislature enacted Article 140 to provide the trial court with the option of awarding punitive damages totaling up to double the amount of royalties due for the lessee's failure to pay the royalties. As a result, the trial court was within its discretion in awarding Gloria's Ranch $242,029.26 in unpaid royalties, plus an additional $484,058.52 in punitive damages for the defendants' failure to pay the royalties.

Gloria's Ranch, L.L.C. v. Tauren Expl., Inc., 51,077 (La. App. 2 Cir. 6/2/17), 223 So. 3d 1202, 1216.

The majority relies on the "generally accepted definition of damages as compensation for the loss sustained" for its interpretation that the royalties due are part of the damages contemplated by La. Mineral Code art. 140. Slip Opinion at 20. However, as noted above, this interpretation does not square with the language of the preceding article. In my opinion, both articles clearly provide for an *additional* damage award above the royalties due. Thus, I would affirm the lower courts' damage award.